EL PUEBLO DE PUERTO RICO, peticionario, *v.* RAMÓN CASTRO GARCÍA y OTRO, acusados y recurridos.

*Número:* CE-86-8 *Resuelto:* 31 de marzo de 1988

*Miguel A. Cochran Acosta*, abogado de los recurridos; *Carmen A. Bravo de Riefkohl, Procuradora General Auxiliar*, abogada de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

El 23 de enero de 1985 El Pueblo de Puerto Rico presentó varias denuncias contra los acusados recurridos por violación a los·Arts. 6, 8 y 11 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416, 418 y 421, respectivamente. Posteriormente se presentaron las correspondientes acusaciones.

El 7 de agosto de 1985, luego de varios trámites procesales, la defensa presentó un escrito titulado *Moción de Supresión de Evidencia y Moción para Desestimar bajo la Regla 64(e) y (f) de Procedimiento Criminal*.(¹) En cuanto a la desestimación, se alegaba que las acusaciones por violación al Art. 11 de la Ley de Armas de Puerto Rico, *supra*, eran cosa juzgada, por haber sido convictos los acusados recurridos, en relación con los mismos hechos en el Tribunal de

---

(¹) Dicha moción no fue tratada como una moción de supresión de evidencia por ser sus fundamentos defensas afirmativas y en apoyo a la Moción de Desestimación.

Distrito federal, de poseer armas con la serie mutilada bajo 18 U.S.C. secs. 922(b)(2) y 924(a).[2]

El tribunal de instancia resolvió que:

Los planteamientos hechos por la defensa en el sentido de que estaba legítimamente autorizado para tener y poseer armas de fuego en P.R. es una defensa que lo único que hace es refutar las alegaciones de las acusaciones por violación a los Artículos 6 y 8 de la Ley de Armas de P.R.[, 25 L.P.R.A. secs. 416 y 418,] los cuales deben dilucidarse en un juicio plenario y no en una moción de supresión.

Aunque Puerto Rico ha dado un paso de avance en su lucha por conseguir mayor autonomía con el establecimiento del Estado Libre Asociado de Puerto Rico, no podemos afirmar que es un país soberano por lo cual constituye un brazo de la misma soberanía americana y las leyes de los Estados Unidos necesariamente desplazan a las leyes locales que se relacionen con un mismo asunto a base de la doctrina de campo ocupado.

En 21 American Jurisprudence 2d. Sec. 281 se dice lo siguiente:

---

[2] Dichas secciones en lo pertinente disponen:

"922. *Unlawful acts*

. . . . . . . .

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—

. . . . . . . .

"(2) any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance." 18 U.S.C. sec. 922(b)(2).

"924. *Penalties*

"(a) Whoever violates any provision of this chapter or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000, or imprisoned not more than five years, or both, and shall become eligible for parole as the Board of Parole shall determine." 18 U.S.C. sec. 924(a).

"Where the different jurisdictions or courts are 'creations emanating from the same sovereignty', successive prosecutions are impermissible. Thus successive prosecutions by federal and territorial courts contravene the prohibition against double jeopardy since the two courts emanate from the same sovereignty."

Resolvemos que proseguir las acusaciones por violación al Artículo 11 de la Ley de Armas de P.R. violaría la enmienda quinta de la Constitución de los E.U. de América que prohibe [*sic*] el que una persona sea sometida por el mismo delito dos veces a un juicio que pueda ocasionarle la pérdida de vida o la integridad corporal. As[i]mismo se violaría el derecho garantizado al ciudadano por la Carta de Derechos de la Constitución de P.R., (Art. II, sec. 11) a no ser expuesto en riesgo de ser castigado dos veces por el mismo delito. (Escolios omitidos.) *Exhibit* V, págs. 33–34.

En su consecuencia declaró con lugar el planteamiento de la defensa en cuanto al Art. 11 de la Ley de Armas de Puerto Rico, *supra*, y desestimó las correspondientes acusaciones. De dicha resolución acude ante nos el Procurador General. Expedimos auto para revisar.

Debemos examinar, pues, el poder tanto del Gobierno federal como el de los estados (incluso Puerto Rico) para crear delitos y el efecto que tiene sobre la ejecución de ese poder la prohibición constitucional contra la doble exposición bajo la Quinta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, y el Art. II, Sec. 11 de nuestra Constitución, L.P.R.A., Tomo 1.

I

El poder para crear delitos, así como el poder para ponerlos en vigor, no es materia que concierna a Estados Unidos o a Puerto Rico solamente, pues depende en gran medida del derecho internacional, ya que afecta a todas las naciones. Como ejemplo, ningún país puede reclamar poder, bajo el derecho internacional, para prescribir reglas de

conducta en países extranjeros o en otras áreas (como alta mar) fuera de su territorio, sin reconocer un poder recíproco a los países extranjeros. Igualmente, tampoco puede reclamar jurisdicción sobre sus ciudadanos en el extranjero sin reconocer que otras naciones la tienen igualmente sobre los suyos en dicho país.(3)

En Estados Unidos la situación es particularmente complicada por el hecho de que el poder gubernamental está dividido en dos poderes soberanos, el Gobierno nacional o federal y los gobiernos estatales, y por el hecho adicional de que, dentro de sus poderes, cada estado es un poder soberano separado. Como sabemos, bajo la Constitución americana el Gobierno federal tiene sólo los poderes de gobierno otorgados en la Constitución y los estados se reservan todos los demás poderes que no están expresamente delegados en la Constitución. Emda. X, Const. EE.UU., L.P.R.A., Tomo 1; *McCulloch* v. *Maryland*, 17 U.S. 316 (1819); R. Rotunda, J. Nowak y N. Young, *Treatise on Constitutional Law: Substance and Procedure*, Minnesota, Ed. West, 1986, Cap. 3.(4)

---

(3) Para un análisis más detallado del problema de jurisdicción de las naciones para prescribir y poner en vigor reglas de conducta (incluso pero no limitado al área criminal), ver *Reinstatement (Second) of the Foreign Relations Law of the United States*, Sec. 6-93 (1965).

(4) El concepto de soberanía ha sido objeto de múltiples análisis. Una fundamentada exposición señala que:

"The single term 'sovereignty' is used to denote two distinct (although related) concepts of constitutional significance. It refers both to the autonomy of a state with respect to its legislative JURISDICTION and to the supreme authority within the state. There are historical reasons why the same term is used for both, but to confound them is a serious and all-too-common error. The term itself comes from the Latin *superans* (meaning 'rising above' or 'overcoming') through the French *souverain*.

"Sovereignty, in the first sense, is a concept derived from international law. A state is sovereign if it is independent of other states and possesses the authority to determine its relationship to other states and to regulate its own internal affairs. Sovereignty, in this sense, is the essential condition required for member-

■ Este poder de crear delitos, ya sea el de una nación bajo el derecho internacional o el de un estado dentro de

ship in the family of nations. Sovereign states do not ordinarily make treaties or wage formal war except with other states recognized as sovereign. International law also recognizes some communities as semisovereign, that is, as possessing certain, but not all, of the attributes of sovereignty. The members states of a federal union are in this category.

"Internally the several states of the United States are legally sovereign in this sense insofar as they possess jurisdiction, the legitimate authority to declare the law within their territory. But this sovereignty is not unlimited. As the Supreme Court said in PARKER V. BROWN (1943), 'The governments of the states are sovereign within their territory save only as they are subject to the prohibitions of the Constitution or as their action in some measure conflicts with powers delegated to the National Government, or with Congressional legislation enacted in the exercise of those powers." The jurisdiction of the states is constitutionally limited by subject as well as by territory, but within their sphere the state governments are as supreme as the national government is within its sphere. This is the meaning of what JAMES MADISON in THE FEDERALIST #39 called the 'compound republic.'

"The states enjoy some other attributes of sovereignty: they may not without their consent be sued in their own courts or in the courts of the United States (see SOVEREIGN IMMUNITY; ELEVENTH AMENDMENT) and they possess independent and plenary authority to lay and collect taxes on persons, things, or transactions within their jurisdiction. Among themselves, also, the states are sovereign. The jurisdiction of a state is exclusive of the other states. Disputes between or among states in cases not governed by the Constitution, and INTERSTATE COMPACT, or a federal statute are resolved according to the principles of international law. But the sovereignty of the states does not limit or diminish the sovereignty of the Union. In all international affairs and in domestic affairs properly subject to it, the government of the United States is sovereign. Without its consent, the United States may not be sued in the courts either of the United States or of the several states.

"In political theory sovereignty is generally held to be indivisible; careful writers thus distinguish between the indivisible sovereignty of the people and the powers or attributes of sovereignty that are divided between the national and state governments. Hence ALEXANDER HAMILTON, in THE FEDERALIST #32, wrote of 'the division of the sovereign power.' But not all political actors are so careful; it is not uncommon for politicians, judges, or commentators to refer to a 'division of sovereignty' in the federal system.

"The second meaning of sovereignty as the single, supreme authority within a state, above the law and uncontrollable except by its own will, was introduced into political theory by JEAN BODIN in his SIX BOOKES OF THE COMMONWEALTH (1576). Its most extreme expression was given by THOMAS HOBBES who, in LEVIATHAN (1651), asserted that opposition to tyranny was identical with opposition to sovereignty, or, in other words, that there is no standard except its own will against which the actions of the sovereign can be judged. A

una nación bajo la ley doméstica, descansa en varios principios jurídicos que fijan el alcance de la validez de las leyes penales de todo estado autónomo con relación a su territorio.

---

democratic, but no less radical, form was given to this concept of sovereignty by JEAN-JACQUES ROUSSEAU in THE SOCIAL CONTRACT (1762).

"Originally an analytical or explanatory formulation, the notion of a single, indivisible power in the state became a prescriptive article of the Tory political creed. WILLIAM BLACKSTONE identified the King-in-Parliament as the sovereign in England. Governor THOMAS HUTCHINSON, in his famous dispute with the Massachusetts Assembly in 1773, ascribed that same status to Parliament within the British Empire —denying that the provincial legislatures of America had any power or authority except by Parliament's grace. To the Whigs of America the Hobbesian idea of sovereignty, as it was stated by HUTCHINSON, represented a threat to the liberty they had inherited and the self-government they had established. As an empirical assertion the indivisibility of sovereignty seemed to be disproved by the federal systems of Germany, Switzerland, and the Netherlands, as well as by the British imperial system as it existed in the mid-eighteenth century; and as a prescriptive formula it was all too clearly intended to subvert American home rule.

"The social contract theory expressed in the DECLARATION OF INDEPENDENCE and the first stated constitutions was a rejection of the Tory doctrine of sovereignty. Neither the government nor any branch or officer of the government justly exercises any power except by the consent of the governed. The doctrine of equality of rights means that no person or body of persons is above the law. The claim of the Declaration, our most fundamental constitutional document, is that there can be no sovereign but the people. This doctrine of POPULAR SOVEREIGNTY was identified by ALEXIS DE TOCQUEVILLE as the defining characteristic of American constitutionalism. Both the national and state governments derive their powers from the people through the Constitution. Each exercises jurisdiction, but neither possesses sovereignty in the absolute, Hobbesian sense.

"The Hobbesian notion of sovereignty was translated from a political to a legal concept in the nineteenth century by the British jurist John Austin, who argued that there was no HIGHER LAW against which the decrees of the state could be measured, and so the power of the legislature was absolute. In this revived form it was brought to America as part of the intellectual baggage of legal positivism.

"Throughout American history a favorite rhetorical device has been to identify one level of government —usually the state— as sovereign. The success of this device depends upon the ambiguity of the term. That a political body exercises jurisdiction, is supreme within its sphere, and is autonomous in its internal affair[s] does not mean that it, its government, or its legislature is immune to the sanctions of the law or is free of the constraints of higher law. To speak of the 'sovereign states' is not entirely inaccurate if the speaker refers to their autonomy within their own sphere, but it derives its force by evoking the notion of indivisibility and illimitability drawn from the other sense of the term. The rheto-

Son ellas: el principio de territorialidad; el principio real o de protección, el principio de la nacionalidad o personal; el principio de la comunidad de intereses o universal, y el principio de la personalidad pasiva. Los diferentes ordenamientos jurídicos aplican de manera combinada todos o algunos de estos principios. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, Sec. 4.2.1; W.R. LaFave y A.W. Scott, *Criminal Law*, Minnesota, West Pubs. Co., 1972, Sec. 15. La profesora Nevares-Muñiz nos explica estos principios de la manera siguiente:

> El *principio de territorialidad* constituye la regla y se refiere a que la ley penal del Estado se aplicará a toda persona que cometa delito en su territorio, incluyendo el espacio marí-

---

ric seemingly denies that the sovereign states are comprised within a sovereign Union.

"Within the American regime the ultimate power and authority to alter or abolish the constitutions of government of state and Union resides only and inalienably with the people. If it be necessary or useful to use the term 'sovereignty' in the sense of ultimate political power, then there is no sovereign in America but the people." *Encyclopedia of the American Constitution*, Nueva York, MacMillan Publ., 1986, Vol. 4, págs. 1714–1716.

Se ha señalado, además, que en un sentido práctico, soberanía es en gran medida una cuestión de gradación, J.G. Starke, *An Introduction to International Law*, 5ta ed., Londres, Ed. Butterworths, 1968, Cap. 5, pág. 92, donde también se comenta que:

"'Soberanía'" es, por lo tanto, un término artístico más que una expresión legal capaz de definirse con precisión." (Traducción nuestra.)

Por estar directamente relacionada con nuestra historia constitucional moderna, José Trías Monge recoge el pensamiento siguiente de Muñoz Marín:

"A continuación señalaba Muñoz los cambios que a su juicio exigían un nuevo enfoque del problema. En actuaciones y expresiones anteriores de su pensamiento, comenzando aun antes de 1940, había ya, como hemos observado, conciencia de ellos:

'Unas de las cosas que ha variado profundamente es el entendimiento de lo que significa soberanía. Otra es el entendimiento de lo que significa libertad. Soberanía no es un documento que dice que hay soberanía. Soberanía es una trabazón de fuerzas que producen el poder real para ejecutar hasta cierto grado —nunca absolutamente— la voluntad de un pueblo . . .'." J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Univ. de P.R., Vol. III, pág. 2.

timo y aéreo. Los demás principios, por lo general, tienen aplicación para delitos realizados extraterritorialmente, o sea, fuera del territorio nacional.

El *principio real o de protección* se basa en que hay un daño a los intereses nacionales. No importa donde se cometa la conducta, si la misma afecta la seguridad o el funcionamiento del Estado, éste podrá juzgar a la persona. Este principio está dirigido a conducta que ocurra fuera del territorio nacional, pero que afecta la seguridad del Estado o la operación de sus funciones de gobierno. Por lo general, los tratadistas proveen como ejemplos donde puede aplicarse el principio real a delitos de falsificación de moneda cometidos en el extranjero, delitos postales; también los cometidos por funcionarios públicos en el ejercicio de sus funciones.

Según el *principio de nacionalidad o personal* se puede castigar aquellos actos que se cometan en otro Estado por los nacionales o por los ciudadanos del Estado que está castigando. Este principio tiene una base personal y se origina en el derecho internacional. El mismo aplica de manera supletoria, cuando la persona no ha sido responsabilizada en el territorio donde cometió el delito. Este principio es una consecuencia de la cláusula de no entrega del nacional que se estipula en los tratados de extradición. Sobre extradición en general véase RODRIGUEZ DEVESA, 225–237; en Puerto Rico, NEVARES-MUÑIZ, *Sumario*, cap. 18.

El *principio universal* postula que hay ciertos delitos que son tan peligrosos que cualquier Estado que tenga custodia del delincuente puede asumir jurisdicción penal sobre él, si es que no ha sido procesado. Los Estados Unidos han reconocido este principio en delitos de piratería, colisión en alta mar, conservación de peces, y tráfico de drogas. En los últimos años se ha extendido a violaciones de derechos humanos.

El *principio de la personalidad pasiva* descansa en que una nación puede tipificar conducta delictiva basada en la nacionalidad de la víctima. Está orientado en la protección a sus ciudadanos en cualquier parte del mundo. En el derecho internacional este principio tiene un status bastante incierto y su validez ha sido cuestionada por los Estados Unidos por aten-

tar contra el principio de legalidad. Nevares-Muñiz, *op. cit.*, págs. 70–71.(5)

A su vez, los tratadistas LaFave y Scott nos explican que:

El poder del gobierno federal para crear delitos cae principalmente bajo dos amplias categorías: (1) su poder, bastante amplio en términos de materia, sobre conducta en territorio propiedad o controlado por las autoridades federales (en tierra, agua o aire) que no están bajo la jurisdicción de ningún estado de Estados Unidos, y sobre conducta de los ciudadanos norteamericanos fuera de la jurisdicción de los estados, y (2) su poder, mucho más limitado en cuanto a la materia, sobre la conducta que se lleva a cabo dentro de las fronteras de Estados Unidos, pero a su vez dentro del territorio ocupado por los estados.

En la primera categoría, donde el gobierno federal debe asumir todo el peso del procedimiento criminal sin ayuda de los estados, puede decirse que el gobierno federal tiene amplio "poder de razón de estado" para regular la conducta (prescribiendo penalidades criminales por violaciones), en interés de la salud pública, la seguridad, la moral y el bienestar general. Dentro de esta categoría se encuentran: (a) la conducta en áreas de terrenos federales no localizados en los estados . . .; (b) la conducta en zonas federales (islas de territorios federales localizadas dentro de los estados), como guarniciones militares, bases navales, edificios de correos y parques nacionales; (c) la conducta en embarcaciones y aviones de nacionalidad norteamericana cuando están fuera de la jurisdicción de los estados, como en alta mar o en aguas extranjeras, y (d) la conducta de ciudadanos de Estados Unidos que se lleve a cabo fuera de la jurisdicción de cualquier estado de la Unión, como en alta mar o en tierras ex-

---

(5) Véanse, además, E. Cuello Calón, *Derecho Penal, Parte General*, 18va ed., Barcelona, Ed. Bosch, 1980, T. I, Vol. 1, págs. 239–259; J.M. Rodríguez Devesa, *Derecho Penal Español: Parte General*, 8va ed., Madrid, Ed. Gráficas Carasa, 1981, págs. 208–218; H. Silving, *Elementos Constitutivos del Delito*, Río Piedras, Ed. Universitaria, 1976, págs. 42–45.

tranjeras. Las bases para ese poder descansan en la territorialidad o en la nacionalidad. Además, bajo la primera categoría, existe un poder limitado en el gobierno federal para proteger sus intereses contra conducta dañina de extranjeros fuera del territorio nacional —de la jurisdicción— el "principio de protección", un poder que no está basado en territorialidad o nacionalidad.

En la segunda categoría —en cuanto al poder federal para regular la conducta ocurrida dentro de Estados Unidos, pero a su vez dentro de los estados— no existe tal amplio "poder de razón de estado" para regular y prescribir penas. En esta área del derecho, el poder de gobierno de Estados Unidos está dividido entre la nación y los estados; el gobierno nacional sólo puede ejercer los poderes expresamente, o (más a menudo) implícitos bajo la cláusula de lo "propio y necesario", otorgada por la Constitución.(6) (Traducción nuestra.) W.R. LaFave y A.W. Scott, *Substantive Criminal Law*, Minnesota, West Pub. Co., 1986, Vol. I, Sec. 2.8, págs. 164–165.

Debe quedar claro, entonces, que además de su poder para reglamentar conducta en territorio propiedad o controlado por autoridades federales y sobre la conducta de sus ciudadanos fuera de la jurisdicción de los estados bajo los principios antes enunciados:

. . . [e]l gobierno federal tiene el poder para crear crímenes estatutarios, que regulen la conducta dentro de Estados Unidos, sin tomar en consideración la territorialidad o la nacionalidad federal, donde la Constitución de Estados Unidos expresamente le concede al Congreso ese poder,(7) o mucho

---

(6) Art. I, Sec. 8, Const. EE.UU., L.P.R.A., Tomo 1, ed. 1982, págs. 173–174:

"El Congreso tendrá facultad: . . . [p]ara aprobar todas las leyes que fueren necesarias y convenientes para poner en práctica las precedentes facultades, así como todas aquellas que en virtud de esta Constitución puedan estar investidas en el Gobierno de los Estados Unidos o en cualquiera de sus departamentos o funcionarios."

(7) Como ejemplo tenemos el Art. I, Sec. 8, Const. EE.UU., *supra*: poder para castigar la falsificación, piratería, delitos graves cometidos en alta mar, así

más común, porque la Constitución le da al Congreso el poder de hacer lo que sea "propio y necesario" para llevar a cabo los poderes expresamente conferidos, como el poder para regular el comercio interestatal, establecer oficinas de correos, imponer tributos, ir a la guerra y así sucesivamente. . . .(8)

. . . . . . . . .

Los estados, distinto al gobierno federal, pueden declarar conducta como delictiva sin necesidad de buscar autoridad, expresa o implícita, en su constitución, pues se reconoce comúnmente que los estados tienen un poder regulador (llamado usualmente "poder de razón de estado") para reglamentar sus asuntos internos en protección o fomento de la salud pública, la seguridad y la moral o —en términos menos precisos— para proteger o promover el bienestar público. (Traducción nuestra.) LaFave y Scott, *op. cit.*, págs. 172–173, 179.

Por supuesto, existen limitaciones a ese poder impuestas por la Constitución y estatutos federales, los tratados y por la Constitución de cada estado en particular.

II

■ Puerto Rico está facultado, como si fuera un estado, para aprobar y hacer cumplir un código penal. *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico*, 458 U.S. 592 (1982).(9)

---

como infracciones al derecho internacional, y el Art. III, Sec. 3, Const. EE.UU., L.P.R.A., Tomo 1: poder para castigar por traición.

(8) Para ejemplos sobre poder del gobierno federal para crear crímenes bajo estos poderes ver: *United States* v. *Darby*, 312 U.S. 100 (1941) (bajo cláusula de comercio); *Nigro* v. *United States*, 276 U.S. 332 (1928); *Sonzinsky* v. *United States*, 300 U.S. 506 (1937); *United States* v. *Kahriger*, 345 U.S. 22 (1953) (bajo poder de tributación); *Yakus* v. *United States*, 321 U.S. 414 (1944) (bajo poder de guerra).

(9) En *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico*, 458 U.S. 592, 608 esc. 15 (1982), se resuelve que:

"Aunque a lo largo hemos hablado de la capacidad de los 'estados' como *parens patriae*, coincidimos con las cortes inferiores y las partes en que el Estado Libre Asociado está similarmente situado a un estado en este aspecto: Tiene un derecho de representar sus intereses cuasi-soberanos en la corte federal por lo menos tan fuerte como el de cualquier estado." (Traducción nuestra.)

 El Estado Libre Asociado, en el ejercicio de su autonomía, tiene jurisdicción para aplicar sus leyes penales a todas las personas que cometan delito dentro de su extensión territorial.(10) La ley penal del cuerpo político aplica a todos los delitos cometidos dentro de su territorio. Se entiende por territorio de un estado el espacio comprendido dentro de sus fronteras. Se trata del territorio que abarca la tierra firme, así como las islas, ríos, lagos, canales y puertos. También se considera territorio el mar que baña las playas y las costas sobre las cuales se extenderá su soberanía. Nevares-Muñiz, *op. cit.*, Sec. 4.2.3, págs. 71–72.

 Nuestro Código Penal, en sus Arts. 2, 3 y 10 (33 L.P.R.A. secs. 3002, 3003 y 3042), delimita el ámbito de aplicación de la ley penal en el Estado Libre Asociado de Puerto Rico.(11) Estos artículos recogen, respectivamente, el principio general de territorialidad y el principio de protección li-

---

(10) Esta jurisdicción local en el ámbito penal fue expresamente reconocida en el Art. XI del Tratado de Paz de París, Bevans, 11 *Treaties and other International agreements of the U.S.*, pág. 619, y C. Ramos de Santiago, *El Desarrollo Constitucional de Puerto Rico*, 2da ed., Río Piedras, Ed. Universitaria, 1979, pág. 36.

(11) "Artículo 2. Aplicación territorial de la Ley Penal

"Este Código se aplicará por delito consumado o intentado:

"(a) En la extensión territorial del Estado Libre Asociado de Puerto Rico; o

"(b) Fuera del Estado Libre Asociado de Puerto Rico cuando el resultado delictivo se produce en su extensión territorial; o

"(c) Fuera del Estado Libre Asociado de Puerto Rico por funcionario o empleado público, o persona a su servicio, cuando constituya una violación de sus funciones o deberes inherentes a su cargo o encomienda.

"Artículo 3. Definición de Extensión territorial

"Se entiende por extensión territorial el espacio de tierra, mar y aire sujeto a la jurisdicción del Estado Libre Asociado de Puerto Rico.

"Artículo 10. Lugar del Delito

"El delito se considera cometido:

"(a) Donde se ha ejecutado la acción o donde debía ejecutarse la acción omitida.

"(b) Donde se ha producido o debía producirse el resultado en Puerto Rico, en aquellos casos en que la acción se ha ejecutado o la omisión se ha incurrido fuera del Estado Libre Asociado de Puerto Rico." 1974 Leyes de Puerto Rico 449, 450 y 454.

mitado a delitos cometidos por funcionarios estatales en el desempeño de sus cargos, la definición de la extensión territorial y el lugar en que se considera cometido el delito.

## III

■ Como hemos visto, el Gobierno federal y los gobiernos estatales tienen jurisdicción concurrente sobre un sinnúmero de actividades criminales: el Estado sobre el robo del banco, el Gobierno federal sobre el robo a una institución federalmente asegurada; el Estado sobre el hurto de autos, el Gobierno federal sobre la transportación interestatal de un vehículo hurtado, y así sucesivamente. En estas situaciones surge la pregunta, como en nuestro caso, de si el ofensor puede ser sujeto sólo al procedimiento estatal, sólo al federal o a ambos.

■ Es un principio de derecho firmemente establecido que ninguna persona debe ser puesta en riesgo de ser castigada dos veces por la misma ofensa. Sus orígenes pueden ser trazados hasta el derecho de Roma y Grecia. M.C. Bassionni, *Substantive Criminal Law*, Illinois, Charles C. Thomas Publ., 1978, Sec. 5.2.4. La Quinta Enmienda de la Constitución de Estados Unidos, *supra*, encarna la protección contra la doble exposición.(12) Esta disposición ha sido adoptada prácticamente por todos los estados,(13) incluso

---

(12) "[N]i podrá nadie ser sometido por el mismo delito dos veces a un juicio que pueda ocasionarle la pérdida de la vida o la integridad corporal . . . ." Emda. V, Const. EE.UU., L.P.R.A., Tomo 1, ed. 1982, pág. 188. Para una discusión de la historia de esta disposición en Estados Unidos, ver la opinión disidente del Juez Frankfurter en *Green* v. *United States*, 355 U.S. 184 (1957).

(13) Aunque el lenguaje puede variar, todos, excepto cinco de los estados, tienen disposiciones constitucionales contra la doble exposición. Los estados que no la tienen, Connecticut, Maryland, Massachusetts, North Carolina y Vermont, consideran la protección contra la doble exposición parte de su derecho común. Véanse: *State* v. *Berham*, 7 Conn. 414 (1829); *Gilpin* v. *State*, 121 A. 354 (1923);

Puerto Rico. Art. II, Sec. 11, Const. E.L.A., *supra*. En *Palko* v. *Connecticut*, 302 U.S. 319 (1937), el Tribunal Supremo federal resolvió que la protección contra la doble exposición que emanaba de esta disposición y aplicable a los tribunales federales no se adapta en la misma forma a los procedimientos en los estados; en casos estatales el debido proceso, bajo la Decimocuarta Enmienda, protegía al acusado contra el riesgo de ser nuevamente expuesto sólo si lo sujetaba "a una penalidad tan aguda y chocante, que nuestra sociedad no puede resistir". *Palko* v. *Connecticut*, supra, pág. 328. El Tribunal Supremo federal continuó aplicando este escrutinio hasta que en *Benton* v. *Maryland*, 395 U.S. 784 (1969), se revocó a *Palko* v. *Connecticut*, supra, y se resolvió que la disposición constitucional contra la doble exposición consagrada en la Quinta Enmienda fue incorporada en la Decimocuarta Enmienda y, por tanto, aplicable a los estados. Al llegar a esa conclusión el Tribunal Supremo federal en *Benton* v. *Maryland*, supra, enfatizó que la protección contra la doble exposición era "fundamental al esquema americano de justicia". (Traducción nuestra.) Sin embargo, esta decisión no afectó al Gobierno federal ni a los estados en su interrelación como soberanos.

▮ Es doctrina sólidamente arraigada en la jurisprudencia norteamericana que la disposición prohibitoria de la doble exposición consagrada en la Quinta Enmienda de la Constitución de Estados Unidos no impide que los tribunales de un estado y los tribunales federales procesen criminalmente a una persona por delitos surgidos de un mismo acto o curso de conducta. En *United States* v. *Lanza*, 260 U.S. 377, 382 (1922), el Tribunal promulgó lo que comúnmente se conoce como la doctrina de soberanía dual: "[U]n acto denun-

*Commonwealth* v. *McCan*, 277 Mass. 199, 178 N.W. 633 (1931); *State* v. *O'Brien*, 170 A. 98 (1934).

ciado como un crimen por las soberanías nacional y estatal es una ofensa contra la paz y la dignidad de ambas y puede ser castigada por ambas." (Traducción nuestra.) Que esto quería decir que un procedimiento federal no estaba impedido por un procedimiento estatal previo por la misma conducta fue ratificado en *Abbate* v. *United States*, 359 U.S. 187 (1959). En dicho caso los acusados, quienes alegadamente conspiraron para dinamitar facilidades de una compañía telefónica, hicieron alegación de culpabilidad en un cargo estatal de conspiración para dañar propiedad ajena y recibieron una sentencia de tres meses de prisión, después de la cual fueron enjuiciados en la Corte federal por conspirar para dañar facilidades de comunicación "operada o controlada por los Estados Unidos". El Tribunal resolvió que la convicción federal no estaba prohibida por la cláusula contra la doble exposición.

Al negarse a apartarse de la regla de *United States* v. *Lanza*, supra, y *Abbate* v. *United States*, supra, pág. 195, reiteró las preocupaciones expresadas en casos anteriores al señalar que:

Petitioner asks us to overrule *Lanza*. We decline to do so. No consideration or persuasive reason not presented to the Court in the prior cases is advanced why we should depart from its firmly established principle. On the contrary, undesirable consequences would follow if *Lanza* were overruled. The basic dilemma was recognized over a century ago in *Fox* v. *Ohio*. As was there pointed out, if the States are free to prosecute criminal acts violating their laws, and the resultant state prosecutions bar federal prosecutions based on the same acts, federal law enforcement must necessarily be hindered. For example, the petitioners in this case insist that their Illinois convictions resulting in three months' prison sentences should bar this federal prosecution which could result in a sentence of up to five years. Such a disparity will very often arise when, as in this case, the defendants' acts impinge more seriously on a federal interest than on a state interest. But no

one would suggest that, in order to maintain the effectiveness of federal law enforcement, it is desirable completely to displace state power to prosecute crimes based on acts which might also violate federal law. This would bring about a marked change in the distribution of powers to administer criminal justice, for the States under our federal system have the principal responsibility for defining and prosecuting crimes. See *Screws* v. *United States*, 325 U.S. 91, 109; *Jerome* v. *United States*, 318 U.S. 101, 104–105. Thus, unless the federal authorities could somehow insure that there would be no state prosecutions for particular acts that also constitute federal offenses, the efficiency of federal law enforcement must. suffer if the Double Jeopardy Clause prevents successive state and federal prosecutions.

Cuando más tarde el Tribunal Supremo federal resolvió que la cláusula de doble exposición de la Quinta Enmienda aplicaba a los estados bajo la Decimocuarta Enmienda, *Benton* v. *Maryland*, supra, y rehusó limitar otros derechos constitucionales bajo un razonamiento de la "soberanía dual" similar al de *Abbate* v. *United States*, supra; *Murphy* v. *Waterfront Comm'n*, 378 U.S. 52 (1964), muchos comentaristas entendieron que el Tribunal estaba inclinado a revocar a *Abbate* v. *United States*, supra. LaFave y Scott, *Criminal Procedure*, Sec. 24.5. Pero esto no sucedió; por el contrario, la regla de dicho caso parece estar mucho más arraigada que nunca antes. Así en *United States* v. *Wheeler*, 435 U.S. 313 (1978), el Tribunal, en forma unánime, al señalar que *Abbate* v. *United States*, supra, descansa "en la estructura básica del sistema federal", resolvió que un proceso criminal federal contra un indio no estaba impedido por una convicción previa en una corte de la tribu, ya que las tribus tienen poder soberano para castigar sus ofensores y, por lo tanto, era comparable a los estados en ese aspecto.

Lo opuesto a la situación de *Abbate* v. *United States*, supra, se presentó en el caso de *Bartkus* v. *Illinois*, 359 U.S. 121 (1959), resuelto el mismo día que *Abbate* v. *United*

*States,* supra, donde después de la absolución del acusado en el Tribunal federal por robo de un banco federalmente asegurado, fue convicto en la corte estatal por el mismo robo de banco. El Tribunal volvió a aplicar la doctrina de soberanía dual para sostener la convicción. En este caso el Tribunal señaló que:

> Were the federal prosecution of a comparatively minor offense to prevent state prosecution of so grave an infraction of state law, the result would be a shocking and untoward deprivation of the historic right and obligation of the States to maintain peace and order within their confines. It would be in derogation of our federal system to displace the reserved power of States over state offenses by reason of prosecution of minor federal offenses by federal authorities beyond the control of the States. (Escolio omitido.) *Bartkus* v. *Illinois,* supra, pág. 137.

El Tribunal Supremo federal ha sostenido la continua validez de *Bartkus* v. *Illinois,* supra; *United States* v. *Wheeler,* supra, *Heath* v. *Alabama,* 474 U.S. 82 (1985), y las cortes estatales consistentemente han rechazado argumentos en su contra. *State* v. *Moellor,* 178 Conn. 67, 420 A.2d 1153 (1979), *cert.* denegado, 444 U.S. 950, y los numerosos casos allí citados.

Según estos casos, la cuestión es determinar, para la aplicación de esta doctrina, si las dos entidades que pretenden procesar a un acusado por el mismo curso de conducta son soberanos para efectos de la Quinta Enmienda. Esta soberanía es determinada por la fuente definitiva o esencial de donde derivan su poder para procesar al acusado: ". . . [L]a fuente fundamental de poder bajo el cual los respectivos enjuiciamientos fueron emprendidos." (Traducción nuestra.) *United States* v. *Wheeler,* supra, pág. 320. Entonces cada entidad debe tener soberanía para llevar a cabo el proceso criminal.

## IV

El acusado recurrido argumenta que Puerto Rico no es un país soberano para efectos de esta doctrina. Su alegación fue acogida por el tribunal de instancia fundamentándose en el caso de *Puerto Rico* v. *Shell Co.*, 302 U.S. 253 (1937), donde el Tribunal Supremo de Estados Unidos señaló que, dada la condición territorial de Puerto Rico en aquel momento, sus leyes emanaban de un solo poder soberano, el poder federal, y conforme a ese análisis expresó que *de surgir* una situación de procesos criminales sucesivos en un tribunal federal y de un tribunal de Puerto Rico aplicaría la defensa de doble exposición.

Primero debemos ver el alcance del caso de *Puerto Rico* v. *Shell Co.*, supra, y luego la vigencia del mismo en estos momentos. Para comenzar debemos señalar que en el caso de *Puerto Rico* v. *Shell Co.*, supra, no estaba en controversia la aplicación de la doctrina de soberanía dual a Puerto Rico, por lo que las expresiones allí vertidas son *dictum*. Así, la misma opinión del Tribunal establece que:

> La *única cuestión* que tenemos que decidir es si la existencia de la Sec. 3 de la Ley Sherman precluye la aprobación de la ley local por la legislatura insular. (Énfasis suplido y traducción nuestra.) *Puerto Rico* v. *Shell Co.*, supra, pág. 255.

El Tribunal sostuvo la validez y vigencia de la ley local. Luego de un detallado análisis de las leyes orgánicas que regían las relaciones entre Puerto Rico y Estados Unidos, y la naturaleza de nuestro gobierno, se resolvió que:[14]

> La intención de la Ley Foraker y de la Ley Orgánica fue dar a Puerto Rico el pleno poder para la autodeterminación local, con una autonomía similar a las de los estados y territorios incorporados ([c]asos citados). El resultado fue conferir al territorio muchos de los atributos de la *quasi*-soberanía poseída

---

[14] Traducción incorporada en Ramos de Santiago, *op. cit.*, págs. 360–361.

por los estados —como por ejemplo, inmunidad de ser parte de un litigio sin su consentimiento. (Casos citados.) Por dichas leyes, la estructura gubernamental americana típica consistente de tres poderes independientes —legislativo, ejecutivo y judicial— fue establecida. "Un cuerpo político" —un commonwealth— fue creado, 31 St. 79, Sec. 7, c. 191. El poder para establecer impuestos, el poder de hacer, y hacer cumplir las leyes y otros poderes característicos del gobierno le fueron otorgados. Y en todo lo concerniente a los asuntos locales, como ya hemos presentado con respecto a los territorios continentales, le fueron conferidos casi todos, si no todos los poderes legislativos en grado tan amplio como el ejercido por las legislaturas de los estados.

Esta amplia concesión del poder legislativo hecha por el Congreso claramente reconocía la gran deseabilidad de devolver al gobierno local la responsabilidad de perseguir los delitos locales y juzgarlos en los tribunales locales. El Tribunal Supremo Insular, en este caso, declaró en términos enfáticos el buen juicio de tal control local con respecto al asunto tratado por la ley en cuestión. Aun cuando establecía, con evidente disgusto, que la ley era inválida, aquel Tribunal dijo: "El derecho de la Legislatura Insular y de los funcionarios a perseguir y castigar aquellos monopolios que puedan establecerse dentro de nuestra jurisdicción es realmente inestimable. Así se entendió por nuestra Legislatura cuando se autoerigió para legislar sobre tal asunto. Esta es una necesaria y saludable legislación que debería ser obligada a cumplir por medio de los Tribunales insulares. Es necesario admitir que El Pueblo de Puerto Rico tiene un especial interés en llevar ante los tribunales aquellos ciudadanos que hayan viciado sus propias leyes. No importa cuán interesado pueda estar el Gobierno Nacional en llevar ante los tribunales tales delitos, casos podrían ocurrir donde los mismos podrían pasar desconocidos para los funcionarios federales, o donde, por alguna razón u otra, tales funcionarios podrían no desplegar la misma actividad e interés que es de esperarse en los funcionarios locales."

A la luz de las anteriores consideraciones incluyendo la amplia concesión de poder congresional contenido en la Ley Foraker y en la Ley Orgánica de 1917, queda patente el propósito general del Congreso, de conferir el poder al go-

bierno de Puerto Rico para legislar con respecto a todas las materias locales. En esta relación es significativo que la única limitación expresa sobre tal poder es que, en algunos aspectos, éste deberá ser ejercido de conformidad con las disposiciones de las respectivas leyes. Véase las Secciones 37, 57 de la Ley Orgánica y la Sección 32 de la Ley Foraker. Nada hay contenido en esas leyes y, hasta donde nosotros tenemos información, en ninguna otra ley federal, que sugiera un intento por parte del Congreso de limitar el ejercicio del poder de legislar localmente sobre aquellos asuntos con respecto a los cuales hay una explícita ausencia de legislación del Congreso; y no encontramos nada en la naturaleza del poder o en sus consecuencias, que puedan seguirse del ejercicio duplicado de éste, que requiera una implicación a ese efecto.

En contestación a un planteamiento sobre una situación no presente en el caso es que el Tribunal resuelve que:

Es igualmente claro que la duplicación legislativa no levanta el peligro de un segundo enjuiciamiento y convicción, o de un doble castigo por la misma ofensa. El riesgo de doble exposición no existe. Tanto las leyes y cortes territoriales y federales, ya sea que estén ejerciendo jurisdicción federal o local, son criaturas emanentes de la misma soberanía. Véase *Balzac* v. *Porto Rico*, supra (258 U.S. p. 312, 66 L. Ed. 634, 42 S. Ct. 343). La prosecusión bajo una de las leyes en el tribunal apropiado, necesariamente, impedirá una prosecución bajo la otra ley en otro tribunal.

En cuanto a la vigencia de las expresiones vertidas mediante *dictum* en aquel momento, 1937,([15]) entendemos que

---

([15]) Para un análisis detallado de *Puerto Rico* v. *Shell Co.*, 302 U.S. 253 (1937), y otras decisiones sobre los atributos de soberanía de Puerto Rico antes del 1952, véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Río Piedras, Ed. Inst. de Educ. Pract., 1986, Vol. I, págs. 482–483. Igualmente para un análisis exhaustivo de la legislación, jurisprudencia e historia política pasada de Puerto Rico, consúltense: L.J. Gould, *La Ley Foraker: raíces de la política de los Estados Unidos*, 2da ed., Colección Uprex, Ed. Universitaria, 1975 (traducción al español de Jorge Luis Morales), en especial las págs. 223–257, en que se discuten los llamados "casos insulares". De gran utilidad resulta el

al presente han perdido cualquier apoyo jurídico y deben descansar en paz. Los casos donde el Tribunal Supremo federal ha aplicado el principio de soberanía dual fuera de la situación de procedimientos sucesivos en cortes federales y estatales o en cortes de dos estados, *Heath* v. *Alabama*, supra, deben ilustrar nuestro análisis. *United States* v. *Wheeler*, supra, es particularmente instructivo, porque allí el Tribunal Supremo federal expresamente rehusó encontrar que sólo los gobiernos de los estados y el Gobierno federal pueden ser considerados soberanos distintos entre ellos para efectos de doble exposición, al señalar que "un alcance tan restrictivo del concepto de soberanía dual . . . requeriría desatender las propias palabras de la cláusula sobre Exposición". *United States* v. *Wheeler*, supra, pág. 330. En vez, el Tribunal en el caso anterior reiteró el principio de que la soberanía de las dos entidades que están procesando, para nuestros própositos, es determinada por la fuente de donde derivan su poder para procesar al acusado. Bajo este análisis y razonamiento el Tribunal resolvió que una tribu Navajo, aun cuando está bajo el control último del Congreso, es una soberanía independiente del Gobierno federal, para própositos de la doctrina de soberanía dual, por emanar su poder para procesar a sus miembros de su "soberanía primitiva (*primeral sovereignty*)". *United States* v. *Wheeler*, supra, pág. 328. Este razonamiento fue recientemente confirmado en *Heath* v. *Alabama*, supra, pág. 102, n. 2, donde el Tribunal Supremo federal expresó que:

> *United States* v. *Wheeler*, 435 U.S. 313 (1978), where the Court upheld successive prosecutions by Federal Government and Navajo tribal authorities, merely recognizes an analogous relationship between two governments with complementary concerns. While the Court noted that "Congress has plenary

---

clásico, G. Lewis, *Puerto Rico: Libertad y Poder en el Caribe*, Río Piedras, Ed. Edil, 1969.

authority to legislate for the Indian tribes in all matters, including their form of government." id., at 319, Congress has in fact wisely refrained from interfering in this sensitive area. The relationship between federal and tribal authorities is thus in this respect *analogous* to that between the Federal Government and the States. (Énfasis nuestro.)

A igual conclusión debemos llegar con respecto a Puerto Rico.

En 1952 el Pueblo de Puerto Rico se organizó políticamente bajo el nombre de Estado Libre Asociado. Por autorización de la Ley de 3 de julio de 1950, Pub. L. No. 600, 1950 U.S. Code Cong. & Admin. News (64 Stat.) 314, del 81er Congreso de Estados Unidos, el Pueblo se reunió en asamblea mediante sus representantes elegidos y redactó su propia Constitución. Desde entonces, el poder político de la isla *emana del consentimiento y voluntad del Pueblo de Puerto Rico*. Art. I, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Puerto Rico es entonces soberano en cuanto a sus asuntos internos. Art. I, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Los Poderes Ejecutivo, Legislativo y Judicial quedaron bajo la autoridad del Pueblo de Puerto Rico en virtud de su voluntad consagrada en la Constitución.

Tanto la jurisprudencia federal, desde los tribunales de distrito hasta el Tribunal Supremo, como la de este Tribunal, han reconocido que desde la aprobación de nuestra Constitución, Puerto Rico advino al ejercicio de una soberanía similar a la de los estados de la Unión en aspectos sumamente fundamentales.

En *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974), al enfrentarse al problema de si las leyes de Puerto Rico eran "leyes estatales" a los efectos de la entonces vigente "Ley de la Corte de Tres Jueces", 28 U.S.C. sec. 2281, en circunstancias donde la jurisprudencia previa había excluido de ese término al entonces territorio de Ha-

waii, el Tribunal reconoció los cambios en el proceso constitucional puertorriqueño. A esos efectos citó con aprobación de la opinión del Juez Magruder en *Mora* v. *Mejías*, 206 F.2d 377, 387 (1953):

> . . . Sin embargo puede ser que el Estado Libre Asociado de Puerto Rico . . . organizado como un cuerpo político por el pueblo de Puerto Rico bajo su propia constitución, de conformidad con los términos del convenio ofrecido a aquél por la Ley Pública 600, y por aquél aceptado, sea un Estado dentro del significado de 28 U.S.C. sec. 2281. El preámbulo de esta constitución hace referencia al Estado Libre Asociado que "en el ejercicio de nuestro derecho natural, nosotros (el pueblo de Puerto Rico) ahora creamos dentro de nuestra unión con los Estados Unidos de América". Puerto Rico por tanto no se convierte en un Estado de la Unión federal como los 48 Estados, pero parecería que se convierte en un estado dentro del significado común y aceptado de la palabra. *Cf. State of Texas* v. *White*, 1868, 7 Wall. 700, 721, 74 *U.S.* 700, 721, 19 L. Ed. 227. Esta es una entidad política creada por una ley y con el consentimiento del pueblo de Puerto Rico y en unión con los Estados Unidos de América bajo los términos de este convenio. (Traducción nuestra y escolio omitido.)

Así, el Tribunal resolvió que las leyes de Puerto Rico eran leyes estatales a los efectos de la citada disposición. Esta decisión tiene particular importancia en nuestro caso, ya que el Tribunal señala que la razón de ser del tribunal de tres jueces era la especial deferencia que merecen los estatutos de los *estados* por parte de los tribunales federales.

Señala el Tribunal que:

> En el caso *Stainback* v. *Mo Hock Ke Lok Po*, 336 U.S. 368 (1949), este Tribunal sostuvo que las leyes del Territorio de Hawaii no eran "leyes estatale[s]" para propósitos del Código Judicial Sec. 266, el predecesor de 28 U.S.C. sec. 2281, indicando:
>
> > "Aunque, por supuesto, todos los tribunales han de tener gran respeto por las leyes de la legislatura territorial

así como por las decisiones de los tribunales territoriales, la razón predominante para establecer el Código Judicial Sec. 266 no existe con respecto a los territorios. *Esta razón fue un propósito congresional para evitar interferencias innecesarias con las leyes de un estado soberano.* En nuestro sistema dual de gobierno, la posición de un estado como soberano en aquellas materias no reguladas por la Constitución requiere una deferencia para con la acción legislativa de un estado que va más allá de la requerida con respecto a las leyes de un territorio. Un territorio está sujeto a la regulación congresional." 336 U.S. a las págs. 377–378 (notas al calce omitidas) (énfasis suplido).

Un razonamiento similar —que el propósito de aislar las leyes de un estado soberano de la interferencia de un juez individual no sería ampliado mediante una interpretación extensiva del término "Estado"— llevó al Tribunal de Apelaciones para el Primer Circuito hace unos 55 años a considerar la Sec. 266 inaplicables a las leyes del Territorio de Puerto Rico. *Benedicto* v. *West India & Panama Tel. Co.*, 256 F. 417 (1919).

Sin embargo, el Congreso creó el Estado Libre Asociado de Puerto Rico después que se decidió el caso *Benedicto*. Como consecuencia de la Guerra Hispano-Americana, Puerto Rico fue cedido a este país en el Tratado de París, 30 Stat. 1754 (1898). Un breve período de control militar fue seguido por la aprobación congresional de una serie de Leyes Orgánicas para el gobierno de la isla. Inicialmente estas leyes establecían una estructura de gobierno local en la que los funcionarios públicos de mayor rango eran nombrados por el Presidente. Esas leyes también daban al Presidente y al Congreso el poder de veto sobre la legislación local. No obstante, en 1950, las presiones para una mayor autonomía llevaron a la aprobación congresional de la Ley Pública 600, 64 Stat. 319, que ofrecía al pueblo de Puerto Rico un convenio por el cual éste podría establecer un gobierno bajo su propia constitución. Puerto Rico aceptó el convenio y, el 3 de julio de 1952, el Congreso aprobó, con enmiendas menores, una constitución adoptada por el pueblo de Puerto Rico, 66 Stat. 327; véase la nota que acompaña a 48 U.S.C. 731d. De acuerdo a esta constitución el Estado Libre Asociado ahora "elige su Gobernador y

Legislatura; nombra sus jueces, todos los oficiales del gabinete, y funcionarios de inferior rango de la Rama Ejecutiva; establece sus propias leyes sobre educación; determina su propio presupuesto, y enmienda sus propios códigos civil y criminal". Leibowitz, *The Applicability of Federal Law to the Commonwealth of Puerto Rico*, 56 Geo. L.J. 219, 221 (1967); véase 28 Dept. of State Bull. 584–589 (1953); *Americana of Puerto Rico Inc.* v. *Kaplus* 368 F.2d 431 (CA 3 1966); Magruder, *The Commonwealth Status of Puerto Rico*, 15 U. Pitt. L. Rev. 1 (1953). (Traducción nuestra y énfasis suplido.) *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, supra, págs. 670–672.

Y añade que:

Los tribunales federales inferiores desde 1953 han adoptado este análisis y han concluido que Puerto Rico ha de ser considerado "soberano sobre aquellos asuntos no regulados por la Constitución" y por tanto un Estado dentro de la norma establecida en la Ley del Tribunal de Tres Jueces. Véanse *Mora* v. *Mejías* 115 F. Supp. 610 (1953); *Marín* v. *University of Puerto Rico*, 346 F. Supp. 470, 481 (P.R. 1972); *Suárez* v. *Administrador del Deporte Hípico de Puerto Rico*, 354 F. Supp. 320 (P.R. 1972). Y en el caso *Wackenhut Corp.* v. *Aponte*, 386 U.S. 268 (1967), confirmamos la decisión de un tribunal de tres jueces del Distrito de Puerto Rico que había ordenado abstención, y decíamos:

"la solicitud de la doctrina de abstención es particularmente apropiada en un caso ... que involucra la interpretación y validez de un estatuto del Estado Libre Asociado de Puerto Rico. Con la debida consideración al status de este Estado Libre Asociado de conformidad con lo que dicta su convenio con el Congreso de los Estados Unidos, creemos que en la primera oportunidad se debería determinar por medio de sus tribunales el propuesto alcance de su propia legislación y decidir sobre la validez de esa legislación tanto de acuerdo a su constitución como a la Constitución de los Estados Unidos." 266 F. Supp. 401, 405 (1966). (Traducción nuestra y escolio omitido.) Íd., págs. 673–674.

En *Rodríguez* v. *Popular Democratic Party*, 457 U.S. 1 (1981), donde se cuestionó sin éxito el procedimiento dis-

puesto por la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 y ss., para cubrir vacantes legislativas, el Tribunal Supremo federal vuelve a señalar que: "Al mismo tiempo Puerto Rico, al igual que un estado es una entidad política, autónoma, soberana sobre materias que no están regidas por la Constitución."

Sumamente pertinente también es para la controversia ante nos, el caso de *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico*, supra. En dicho caso el Tribunal Supremo federal tuvo ante su consideración si Puerto Rico tenía capacidad jurídica para mantener una acción de *parens patriae*. Allí se define y se analiza lo que es el *parens patriae*, entre otros, por el Black's Law Dictionary como:

> *Parens patriae* means literally "parent of the country" [refers traditionally to role of state as sovereign and guardian of persons under legal disability. *Black's Law Dictionary*, 5ta ed., St. Paul, Minn., West Pub. Co., 1979, pág. 1003]. . . . At a fairly early date, American courts recognized this common-law concept, but now in the form of a legislative prerogative: "This prerogative of *parens patriae* is inherent in the supreme power of every State, whether that power is lodged in a royal person or in the legislature [and] is a most beneficent function . . . often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." *Mormon Church* v. *United States*, 136 U.S. 1, 57 (1890). *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico*, supra, pág. 600.

El Tribunal explica que, para mantener este tipo de acción, un estado debe tener un interés cuasi soberano, que se puede identificar, entre otras, de dos maneras:

> . . . First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction —this involves the power to create and enforce a legal code, both civil and criminal; second, the demand for recognition from other sovereigns— most frequently this involves the maintenance and recognition of borders. Íd., pág. 601.

La opinión extiende ese interés a Puerto Rico al resolver que:

> Although we have spoken throughout of a "State's" standing as *parens patriae*, we agree with the lower courts and the parties that the Commonwealth of Puerto Rico is similarly situated to a State in this respect: It has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State. Íd., esc. 15, pág. 608.

Tan recientemente como el 23 de junio de 1987, al invocar el precedente de *Examining Board* v. *Flores de Otero*, 426 U.S. 572, 594 (1976), el Tribunal Supremo nacional reiteró que al crearse el Estado Libre Asociado el propósito de la legislación fue: "[O]torgarle a Puerto Rico el grado de autonomía e independencia normalmente asociadas con Estados de la Unión. . . ." *Puerto Rico* v. *Branstad*, 97 L. Ed.2d 187, 191 n. 5 (1987). Resulta significativo el siguiente llamado que hace el Tribunal en *Puerto Rico* v. *Branstad*, supra, pág. 197, n. 5:

> Respondents contend that "Puerto Rico seeks to force the states to honor its rendition requests even though Congressional representatives of the states have not had an opportunity to consider the admission of Puerto Rico as a state into the Union . . . . Puerto Rico's argument . . . serves to eviscerate the significance of the statehood admissions process." Brief for Respondents 22. *Leaving aside the fact that Congress enacted the legislation which made Puerto Rico first a Territory and then a Commonwealth,* this curious logic would suggest that Iowa is not required to extradite felons to States, such as New York and Massachusetts, whose presence in the Union is not attributable to votes cast in Congress. (Énfasis nuestro.)

Entendemos que dicho lenguaje reitera el principio de que al establecerse el Estado Libre Asociado, las relaciones entre Puerto Rico y el Gobierno federal sufrieron cambios significativos. Ello es así aunque dicho Tribunal nunca haya resuelto que Puerto Rico tiene derecho a todos los beneficios

conferidos a los estados por la Constitución federal. *Puerto Rico* v. *Branstad*, supra.

De igual manera los tribunales federales han reconocido que Puerto Rico tiene un ámbito de soberanía similar a la de los estados de la Unión. *Mora* v. *Torres*, 113 F. Supp. 309 (1953); *Alcoa Steamship Co.* v. *Pérez*, 295 F. Supp. 187 (1968); *United States* v. *Quiñones*, 758 F.2d 40 (1er Cir. 1985); *Enrique Molina-Estrada* v. *Puerto Rico Hwy. Auth.*, 680 F.2d 841 (1er Cir. 1982); *Cordova & Simonpietri Ins.* v. *Chase Manhattan Bank*, 649 F.2d 36 (1er Cir. 1981).[16]

---

[16] En *Córdova & Simonpietri Ins.* v. *Chase Manhattan Bank*, 649 F.2d 36, 41–42 (1er Cir. 1981) se resolvió que el caso de *Puerto Rico* v. *Shell Co.*, supra, quedó supeditado por los cambios en el 1952 en cuanto a la aplicabilidad exclusiva de la Ley Sherman. Para ello utilizó el razonamiento siguiente:

"In sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rican Federal Relations Act and the rights of the people of Puerto Rico as United States citizens. As the Supreme Court has written, 'the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a State of the Union. . . .' *Examining Board of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 277, 49 L.Ed.2d 65 (1976).

"The significance of this change from the point of view of the Sherman Act arises out of the fact that, as a general matter, the Sherman Act ceases to apply to purely local affairs once territories become states, leaving state governments free to enact various local antitrust laws broadly consistent with general federal policy, but occasionally divergent as to details. The local Puerto Rico antitrust act, though virtually identical to the federal act at the time *Shell* was decided, was subsequently modified and has ceased to replicate federal law in every detail. The states are clearly able to adopt such variations as to purely local matters. And, there is no reason of policy discernible in the Sherman Act for treating Puerto Rico differently, given a general Congressional intent to grant Puerto Rico state-like autonomy. We believe that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state. Thus, it is fair to assume that the framers of the Sherman Act, had they been aware of the FRA and subsequent Constitutional developments, would have intended that Puerto Rico be treated as a 'state' under the Act, once Commonwealth status was achieved." (Escolios omitidos.)

Resulta persuasivo el tratamiento que brindó la Corte de Apelaciones para el Primer Circuito a la controversia presente en el caso ante nos. En *U.S.* v. *López Andino*, 831 F.2d 1164, 1167–1168 (1er Cir. 1987) esa corte resolvió lo siguiente:

> For the purposes of this appeal, however, it does not matter whether or not the local and federal prosecutions were for different offenses. Acording to the "dual sovereignty" doctrine, successive prosecutions are not prohibited by the fifth amendment if they are brought by separate sovereigns. As the Supreme Court recently described it, "[t]he dual sovereignty doctrine is founded on the common law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences'" and is subject to prosecution and punishment for both. *Heath* v. *Alabama*, 106 S.Ct. at 437.
>
> The question before us, therefore, is whether Puerto Rico and the United States are "dual sovereigns" for double jeopardy purposes. Prosecuting entities are considered to be separate for double jeopardy purposes when they derive their power from different sources. *Heath* v. *Alabama*, 106 S.Ct. at 437; *United States* v. *Wheeler*, 435 U.S. 313, 319–22, 98 S.Ct. 1079, 1083–85, 55 L.Ed.2d 303 (1978). It is well settled that when states enact and enforce their own criminal laws, they are acting pursuant to their own sovereign power, not that of the national government. *See United States* v. *Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). Puerto Rico's status is not that of a state in the federal union, but, its criminal laws, like those of a state, emanate from a different source than the federal laws.
>
> Although the legal relationship between Puerto Rico and the United States is far from clear and fraught with controversy, it is established that Puerto Rico is to be treated as a state for purposes of the double jeopardy clause. In 1950 Congress enacted legislation "so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." Puerto Rican Federal Relations Act, Pub.L.

No. 600, 64 Stat. 319 (1950). The purpose of the Federal Relations Act "was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union." *Examining Bd. of Eng'rs, Architects and Surveyors* v. *Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976). "Puerto Rico, like a state, is an autonomous political entity, . . . ." *Rodriguez* v. *Popular Democratic Party*, 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982). In *United States* v. *Benmuhar*, 658 F.2d 14, 18 (1st Cir. 1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982), we held, treating Puerto Rico as a state, that a charge under Puerto Rico law for arson and the destruction of an insured building did not preclude a subsequent federal conspiracy prosecution, even though both were based on the same act.

The offenses for which appellants were prosecuted in superior court were against the Commonwealth, which for double jeopardy purposes is treated as a state. Therefore, the fifth amendment did not prohibit the federal prosecution.

Contrario a la premisa fundamental del disenso en dicho caso, acogida por la opinión disidente en este caso, las decisiones en *Harris* v. *Rosario*, 446 U.S. 651 (1980) y *Califano* v. *Torres*, 435 U.S. 1, 55 (1978), no militan contra el resultado a que llegamos. La cuestión a resolver en dichos casos estaba limitada a si el Congreso tenía una base racional para excluir a los residentes de Puerto Rico de ciertos beneficios económicos. Si bien en *Harris* v. *Rosario*, supra, se reconoce el poder del Congreso para legislar respecto a Puerto Rico bajo la cláusula territorial de la Constitución nacional —Art. IV, Sec. 3, Const. EE.UU., L.P.R.A., Tomo 1— ello no quiere decir que Puerto Rico no goza del grado de soberanía para legislar sobre sus asuntos internos, según ésta ha sido reconocida en los casos que hemos citado en esta opinión. Por más que se extienda el alcance de dichas opiniones, las mismas no confligen con la disposición que hacemos de esta controversia. Dicho en otra forma, el hecho de que el Congreso pueda legislar bajo la cláusula territorial no

conlleva el que el Estado Libre Asociado no tenga el suficiente poder soberano para regir la conducta penal de sus ciudadanos. Bajo los limitados alcances de la doctrina sobre soberanía dual, nada impide que Puerto Rico sea tratado igual que un estado de la Unión.(17) En un aspecto relacionado, los tribunales federales han reconocido expresamente que Puerto Rico goza de los atributos de un soberano a los efectos de la doctrina de inmunidad del soberano y nos han aplicado directamente las disposiciones de la Enmienda Once de la Constitución de Estados Unidos.(18)

Así, en *Anaya Serbía* v. *Lausell,* 646 F. Supp. 1236, 1241 n. 2 (CD. P.R. 1986), el Juez Pérez Giménez recoge la doctrina imperante de la forma siguiente:

> A pesar de la falta de estadidad formal, Puerto Rico goza del abrigo de la Enmienda Once. *Ramírez* v. *Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir. 1983); *Ezratty* v. *The Commonwealth of Puerto Rico,* 648 F.2d 770, 776 (1st Cir. 1981); *Paul N. Howard* v. *Puerto Rico Aqueduct Sewer,* 744 F.2d 880 (1st Cir. 1984). (Traducción nuestra.)

Igualmente persuasiva es la decisión de la Corte de Apelaciones para el Primer Circuito en *Culebras Enterprises Corp.* v. *Rivera Ríos,* 813 F.2d 506, 516 (1er Cir. 1987), donde por conducto del Juez Presidente Campbell se resolvió que: "La [E]nmienda [O]nce impide que se recobren daños contra

---

(17) Debemos recordar que en 1953 las Naciones Unidas reconocieron que el Estado Libre Asociado está investido con ciertos atributos de soberanía política que claramente identificaban el *status* de autogobierno logrado como una entidad política autónoma. Véase J. de Passalacqua, *El nuevo pacto a la luz del Derecho internacional,* 37 Rev. C. Abo. P.R. 19, 20 (1976).

(18) Que dispone en su texto español lo siguiente:

"El poder judicial de los Estados Unidos no será interpretado en el sentido de extenderse a los litigios en derecho o en equidad, incoados o seguidos contra uno de los estados de la Unión por ciudadanos de otro estado, o por ciudadanos o súbditos de cualquier estado extranjero." Emda. XI, Const. EE.UU., L.P.R.A., Tomo 1, ed. 1982, pág. 194.

el Estado Libre Asociado de Puerto Rico en una corte federal." (Traducción nuestra.)[19]

Lo anterior nos convence de que no hay razón alguna para diferenciar el grado de soberanía que goza Puerto Rico bajo la Enmienda Once de la Constitución de Estados Unidos, de aquel considerado en las decisiones que implantan la norma sobre soberanía dual.

Este Tribunal también ha tenido la oportunidad de considerar la fuente de donde emana el poder del Estado Libre Asociado dentro del marco del poder para imponer tributos. En *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416, 428–429 (1964) señalamos que:

De esos hechos evidentes de que fueron protagonistas el pueblo de los Estados Unidos por su Congreso y exponente máximo y la comunidad puertorriqueña directamente por sus habitantes capacitados, y a virtud de las expresiones claras y sencillas de esos pueblos contenidas en los varios documentos que perpetuaron los acontecimientos políticos que tuvieron lugar, *en derecho es claro que, contrario a los regímenes territoriales de la Ley Foraker y de la Carta Orgánica de 1917 de autoridad y poderes meramente delegados por el Congreso y sujetos a su supervisión, los poderes públicos y gubernamentales del Estado Libre Asociado de Puerto Rico en la autoridad que le es privativa,* y el más fundamental entre ellos de imponer tributo consustancial con su creación misma como un Estado político y esencial a su subsistencia y para su supervivencia de Estado, *emanan de sí mismo y de su propia autoridad,* y siéndole ésta privativa en lo que concierne al poder de tributación, ejerce este poder libre de autoridad superior, sujeto sólo a las limitaciones de su propia Constitución y su Carta de Derechos, que ya el Congreso determinó que no era contraria a las disposiciones aplicables de la Constitución de los Estados Unidos, y a aquellas obligaciones que el pueblo se impuso al aceptar las relaciones federales que habrían de exis-

---

(19) Al mismo efecto véanse: *Ameluxen* v. *U.P.R.*, 637 F. Supp. 426 (1986); *Pérez* v. *Rodríguez Bou*, 575 F.2d 21, 25 (1978).

tir y existen con los Estados Unidos a tenor de la Ley 600. (Énfasis suplido.)

En la opinión disidente del Juez Asociado Señor Rebollo López se propone que:

Por otro lado, un ligero examen del historial legislativo de dicha ley es más que suficiente para demostrar que, no obstante la intención del Congreso de concederle a Puerto Rico el poder de autogobernarse en cuanto a sus *asuntos internos*, la intención legislativa fue a los efectos de que dicha ley no alteraría en forma alguna el *status* de Puerto Rico respecto a Estados Unidos. (Énfasis en el original.) Opinión disidente, pág. 790.

A continuación procede analizar parte del historial legislativo y el trato que le han dado algunos eminentes comentaristas. El problema con este enfoque restrictivo es que da lugar a la conclusión de que lo único que se logró luego de aprobarse la Ley Núm. 600 y ratificarse nuestra Constitución fue aprobar una nueva Ley Orgánica. Independientemente del trato semántico y legalista que se le dé a los conceptos de territorio y soberanía, lo cierto es que el *status* actual es el producto bilateral de un proceso que goza de la naturaleza de un convenio entre dos entes gubernamentales. A los efectos del punto a resolver, la intención de ambas partes fue reconocer y otorgarle al Pueblo de Puerto Rico un grado de gobierno propio similar a los estados.[20]

---

[20] Podríamos llenar varios tomos de *Decisiones de Puerto Rico* con extensas citas del historial legislativo y las interpretaciones que se le han dado. Ello es imposible. A los efectos ilustrativos veamos algunas de ellas. En A. Fernós Isern, *Estado Libre Asociado de Puerto Rico: antecedentes, creación y desarrollo hasta la época presente*, Río Piedras, Ed. Universitaria, 1974, págs. 155, 161–162, 163–167, se transcriben y se comentan los incidentes ante el Comité de Interior y Asuntos del Senado. Algunos de ellos son:

"De acuerdo el Senador Cordon y el Presidente, el señor Muñoz Marín leyó su declaración escrita. Decía así:

■ No debe haber duda de que para efectos de la doctrina de soberanía dual, Puerto Rico se encuentra en

---

"'Como representantes del Congreso de los Estados Unidos y del pueblo de Puerto Rico cuando este proceso se haya terminado podemos proclamar a todos nuestros conciudadanos, al Hemisferio Americano y al mundo que los últimos vestigios jurídicos de colonialismo han sido abolidos en la relación entre los Estados Unidos y Puerto Rico. Es un trabajo conjunto del cual todos podemos sentirnos profundamente orgullosos. Aunque el status colonial ha ido desapareciendo gradualmente en la práctica, ha faltado el elemento básico moral de libertad que es el consentimiento basado en el libre acuerdo. La bondad, o aun la justicia, unilateralmente concedida puede significar un espíritu anticolonialista, pero no crea final y decididamente un status anticolonial. El principio del convenio contenido en la Ley 600 específicamente y en el hecho de que requiera aprobación por el pueblo de Puerto Rico borra esa falta de moral. Como nosotros lo vemos no estamos dando "otro paso hacia el gobierno propio"; esto es gobierno propio. Yo no digo que los detalles de nuestra relación no puedan mejorarse tanto desde el punto de vista de la Unión Americana como desde el punto de vista de Puerto Rico; pero el principio de que tal relación, como quiera que cambie, es de libre acuerdo, hace del paso que estamos dando el paso definitivo en gobierno propio. De esto yo digo que todos podemos sentirnos en verdad muy orgullosos.

. . . . . . . .

"'El proceso aprobado por el pueblo en las elecciones de 1948 como parte del programa de mayoría sustancialmente incorporado entonces en la Ley 600, sustituyendo el principio de convenio por el de decisión unilateral, la participación de los electores de Puerto Rico en todo el proceso de principio a fin, la naturaleza profundamente educacional de los procedimientos de la Asamblea Constituyente para todo el pueblo, éstos han sido fuerzas liberadoras del dilema angustioso que he descrito a ustedes, caballeros. Se ha visto que la alternativa al dilema no es colonialismo, sino que una nueva alternativa, igual en dignidad aunque con naturaleza diferente, a la independencia y la estadidad federada, puede concebirse y de hecho se está creando por la acción conjunta en el más alto nivel moral del Congreso de los Estados Unidos y el pueblo de Puerto Rico. Puerto Rico no es la vieja realidad de 1900 y 1917 o aún 1945. Es una nueva estrella aun cuando no sea la 49 en el cielo americano. Para una nueva realidad estamos haciendo un nuevo status. Esta es la manera dinámica americana.'

"Tras una interrupción del Presidente para hacer una pregunta al señor Silverman, abogado de la Oficina de Territorios del Departamento de Interior y la respuesta de éste, el senador Lehman reiteró su moción para que se informara favorablemente la Constitución al Senado. Cuando el Presidente del Comité comenzaba a hablar para someter a votación la moción, el senador Malone interrumpió y solicitó permiso para hacer una pregunta. El Presidente accedió. La pregunta del senador Malone dio lugar a una serie de expresiones de parte del Jefe de la División de Territorios . . . así como a nuevas preguntas del senador Malone. Evidentemente, no acertaban a entenderse y expresaban en algunas ocasiones opiniones que no correspondían cabalmente con la adecuada inter-

una situación legal y política muy diferente a la que se encontraba cuando se resolvió el caso de *Puerto Rico* v.

pretación legal de la Ley 600. Por su parte, el Presidente dijo que la ley del Congreso autoriza al pueblo de Puerto Rico a formular y adoptar una Constitución, la cual tenía la naturaleza de un convenio, pero inmediatamente después dijo que él creía que se podía decir que era cosa fundamental que la Constitución de los Estados Unidos le da al Congreso completo control y que nada en la Constitución de Puerto Rico podía afectar o enmendar ese derecho. No es claro el sentido de las palabras del Senador, pero tal parece que quiso decir que el Congreso quedaba en pleno control a pesar del convenio, lo cual es contradictorio.

"Por otra parte, el senador Malone, después de hacer algunas preguntas muy confusas, hizo la siguiente: 'Lo que deseo es que me diga cuál sería el efecto, y qué se podría hacer si fuera contrario al interés de este país, sobre los cuales no tuviéramos control, si se aprobara la Constitución.'

"El señor Silvermann contestó:

"'Como dije antes, el poder supremo sobre nuestros Territorios está en el Congreso de los Estados Unidos bajo la Constitución de los Estados Unidos y el Congreso de los Estados Unidos podría, en cualquier momento, determinar qué curso de acción querría tomar. 'Hacemos ahora un convenio solemne con el pueblo de Puerto Rico con carácter de obligaciones contractuales. Esperamos y espera el gobierno, no intervenir con esas relaciones. Sin embargo, el poder inherente en el Congreso de los Estados Unidos que nadie puede quitarle, está en el Congreso según lo provee la sección 3 del artículo 4 de la Constitución de los Estados Unidos. Podría señalar también que el Congreso de los Estados Unidos tiene el poder inherente bajo las condiciones de anular cualquier ley en cualesquiera de nuestros Territorios y nunca en la historia de los Estados Unidos el Congreso de los Estados Unidos ha anulado una sola ley de la Legislatura en ninguno de esos territorios. Sin embargo, el poder es inherente en el Congreso.'

"Preguntó el senador Malone, '¿permanece o esto anuló eso?' Contestó el señor Silvermann: 'Permanece en el Congreso. El Congreso tiene autoridad para hacer todas las reglas necesarias para los territorios. Esto ha sido interpretado por el Tribunal Supremo de los Estados Unidos comenzando con los casos insulares y una lista larga de decisiones que el poder del Congreso es supremo bajo este artículo.'"

"Siguieron una serie de preguntas por el senador Malone. Dijo el señor Davis: 'Creo que la cuestión es tanto como el señor Silvermann y el señor Presidente han señalado; que nada de lo que se está haciendo aquí, en ningún momento debilita o quebranta el pleno poder del Congreso bajo la Constitución.'

"El senador Malone, sin embargo dijo:

"'Eso es lo que usted nos dice, pero lo hemos hecho tantas veces que estoy un poco escéptico.'

"Volvió a hablar el señor Davis. Dijo Mr. Davis:

"'No creo que hemos señalado lo que tal vez es el elemento más importante envuelto en esto. Hasta este momento el Gobierno del pueblo de Puerto Rico ha sido una ley del Congreso en la cual ellos no tuvieron parte alguna. Desde este

*Shell Co.*, supra. Resolvemos, pues, que el poder del Estado Libre Asociado de Puerto Rico para crear y poner

---

punto en adelante, el gobierno de Puerto Rico sería un gobierno establecido por el pueblo de Puerto Rico con el consentimiento del pueblo de Puerto Rico y ellos tendrán el mismo orgullo en él y la misma lealtad a él, y la misma fidelidad que el pueblo de un estado tiene en la Constitución del estado. La alteración en la situación no está en los poderes del Congreso; no está relacionado en ningún cambio muy importante que fuera a ocurrir inmediatamente como resultado de la Constitución. Está en el hecho de que nosotros recordemos ahora el derecho del pueblo de Puerto Rico a escribir las leyes bajo las cuales ellos se gobiernan localmente.

" 'Estamos aceptando la Constitución que ellos han preparado ellos mismos y han votado para presentar al Congreso para su adopción como la Ley Básica en el gobierno de sus propios asuntos.'

"El senador Cordon dijo:

" '¿Si usted lo acepta, está usted comprometido absolutamente o puede mañana cambiar de opinión, en cuanto a aceptarla, y faltar a la aceptación, negándose entonces a reconocerla en lo sucesivo?'

"A esto contestó el señor Davis:

" 'El pueblo de Puerto Rico ha vivido bajo la Ley Orgánica en diferentes formas por los últimos cincuenta años. El Congreso la sustituye ahora al aceptar la Constitución, la cual sustituye aquella parte cubierta por la Constitución, una nueva ley en vez de la vieja Acta Orgánica.'

" 'En cuanto a la acción del Congreso concierne, parece ser la suma de la acción que se está tomando, pero en cuanto al pueblo de Puerto Rico concierne, es de gran importancia que ellos mismos han formulado la Constitución con el carácter de un convenio y el Congreso ha aceptado o aceptará su Constitución y permitirá que ellos vivan bajo ella.'

"A esto el senador Cordon dijo:

· " 'Desde luego, usted ha dado la vuelta alrededor del rancho, pero la cuestión es directa y usted no la ha contestado. Entonces, déjenme citar de una carta que yo tengo, que contiene una alegada cita del señor José Trías Monge, quien se alega ser miembro de la Asamblea Constituyente, ex primer Procurador General Auxiliar de Puerto Rico, miembro de una oficina de abogados antes establecida en San Juan con el actual Procurador General de la Isla y consejero legal del señor Muñoz Marín.'

"Citó el senador Cordon de la carta, como sigue:

" 'La Ley 600 constituye un convenio entre el Congreso de los Estados Unidos y el pueblo de Puerto Rico en lo que respecta a los derechos de Puerto Rico a administrar sus asuntos locales bajo una Constitución de su propia hechura y al efecto de que las relaciones entre los Estados Unidos y Puerto Rico no se alterarán excepto por convenio de las partes. El convenio tiene fuerza legal. Contrariamente a la tesis de algunos opositores de la Constitución, el Congreso

en vigor delitos emana no sólo del Congreso, sino del consentimiento del Pueblo y, por tanto de sí mismo, por

de los Estados Unidos tiene autoridad constitucional para consumar con el pueblo del territorio un convenio que no puede ser revocado excepto por mutuo consentimiento. La aceptación por el pueblo de Puerto Rico de la ley, la Constitución y el acuerdo consuma su convenio con el Congreso de los Estados Unidos en cada uno de estos puntos. Una vez que se formalice el convenio, la Constitución de Puerto Rico no podría ser enmendada salvo en la forma provista por la Constitución de Puerto Rico misma. Las leyes locales no estarían sujetas a derogación por el Congreso, ni el Estatuto de Relaciones Federales ni la Ley 600 pueden enmendarse sin el consentimiento del pueblo de Puerto Rico.'

"Preguntó entonces el senador Cordon:

"'¿Qué cree usted de eso? Cuando yo tenga una decisión en ese campo estaré listo a votar sobre la Constitución misma. El resto de esto es colateral . . . .'

"A esto contestó el Presidente del Comité:

"'Senador Cordon, la primera oración de la Ley 600 dice como sigue: "Reconociendo plenamente el principio de gobierno por consentimiento se adopta ahora esta ley con el carácter de un convenio, de modo que el pueblo de Puerto Rico pueda organizar un gobierno de acuerdo con una Constitución de su propia adopción.'"

"'Observe la frase "se adopta con el carácter de un convenio".

"'Soy de opinión que cuando este Comité accedió sobre eso, lo establecimos todos bajo la creencia que éste no era un convenio per se, sino un documento con el carácter de un convenio.'

"A esto ripostó el senador Cordon:

"'Me confunde usted. No puedo establecer la diferencia; sería un convenio después que ellos lo aceptaran.'

"Después de una breve interrupción por preguntas incidentales, el Presidente agregó:

"'Iba a decir que en cuanto la Constitución de Puerto Rico se adhiere a los principios de esta ley, la Ley 600 del Congreso 81, y se refiere a asuntos locales, el Congreso de los Estados Unidos, al aprobar la Constitución, *acepta que la autoridad del pueblo de Puerto Rico en sus asuntos locales dentro del dominio y dentro de la esfera de la Ley Pública 600, es completa* y que el Congreso no va a intervenir, pero *si el pueblo de Puerto Rico se extralimita, si se hiciere una tentativa de cambiar la Constitución y tratar de asuntos fuera de la concesión, creo que la autoridad del Congreso de los Estados Unidos bajo la Constitución, no puede menoscabarse o reducirse.*

"'Creo que no debemos pasar por alto el hecho de que un acuerdo con el carácter de un convenio que estábamos haciendo, fue uno bajo el cual el Congreso se reservaba a sí mismo las secciones de Ley Orgánica que se establecieron en la Ley Pública 600, como la Ley de Relaciones Federales, y bajo el cual delega al

lo que le es de aplicación la doctrina de soberanía dual.

---

pueblo de Puerto Rico la autoridad a adoptar sus propias leyes con respecto a la administración local y que esta administración local está dentro de la esfera de *una república democrática, autónoma, libre, similar a la de los Estados Unidos*, pero que no tiene nada que ver con los asuntos cubiertos por las disposiciones que hemos llamado la Ley de Relaciones Federales.'

"Después de otros intercambios intervino el Senador Long: 'Me parece desafortunado que ese lenguaje "con el carácter de un convenio" se deslizó en la ley porque eso sólo puede llevar a confusiones.' A esto ripostó el senador Cordon: 'Hay una historia de legislación sobre convenio de este país, en nuestra Constitución, entre los varios estados y los Estados Unidos.'

"Tanto el Senador Cordon como el Senador Malone señalaron que era tarde y deseaban ir a esa hora (las doce M.) a un almuerzo en honor al señor Muñoz Marín, en el Press Club.

"El Presidente dijo entonces: 'El señor Benítez, Rector de la Universidad de Puerto Rico, se me dice que está presente.' Le preguntó si tenía algún comentario que quería hacer. El señor Benítez tras identificarse, informó al Comité que había sido miembro de la Convención Constituyente y que había presidido el Comité sobre Carta de Derechos, el cual había dirigido en la convención por cinco meses y que él consideraba que el documento podía compararse con cualquier documento moderno en el mundo democrático.

"Se suscitó entonces un diálogo entre el Senador Long y el señor Benítez y luego entre el Senador Malone y el señor Benítez con respecto al alcance de la sección 20 de la Carta de Derechos en la Constitución.

"En una intervención, el Presidente leyó la sección 2 (Art. I), que dice:

"'El gobierno del Estado Libre Asociado de Puerto Rico será de forma republicana y sus poderes legislativos, judicial y ejecutivo según se establecieron por esta Constitución estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico.'

"Tiene la mayor importancia que se haya leído esta sección expresa y específicamente en el Comité por su Presidente cuando se estaba poniendo en tela de juicio si el gobierno que se había de establecer sería republicano o democrático. No se hizo la menor objeción o reparo a esa sección 2. Ello tiene relación muy importante con las palabras que citamos anteriormente del Presidente del Comité con respecto al alcance del convenio y la del Senador Cordon con respecto a la historia de la legislación sobre convenios. En otras palabras, fue con todo conocimiento de lo que estaban haciendo con respecto al reconocimiento a Puerto Rico que quedó aprobada la resolución que declaraba vigente la Constitución de Puerto Rico. Quedó fuera de toda duda que los poderes acordados por el pueblo de Puerto Rico eran limitados ciertamente, pero, dentro de esos límites, eran exclusivos y soberanos." (Énfasis en el original y escolios omitidos.)

█ Negarle a Puerto Rico el poder de poner en vigor sus leyes criminales, por el hecho de que el Gobierno federal o un estado ha ganado la carrera a los tribunales, sería chocante y llevaría a una privación de su histórico derecho y obligación de mantener la paz y el orden dentro de su territorio.

Por estas razones *se revocará la resolución de instancia y se devolverá el caso para que continúen los procedimientos.*

El Juez Asociado Señor Negrón García emitió voto concurrente. El Juez Asociado Señor Rebollo López emitió opinión disidente.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

Concurrimos con el resultado. Es un hecho histórico que a partir de la Constitución del Estado Libre Asociado, aprobada el 25 de julio de 1952, Puerto Rico se proyecta en sus relaciones jurídico-políticas con Estados Unidos como peculiar, diferente y único en la dimensión constitucional del sistema federativo norteamericano. La cuestión ha suscitado, y todavía genera, intensos debates en los distintos sectores de opinión pública. En lo judicial, subsisten áreas de honestas discrepancias de criterio aún no definidas por el Tribunal Supremo federal en su función de intérprete final de la Constitución de Estados Unidos.

Al resolver contra el acusado Castro García su planteamiento, expresamente nos abstendremos de trasladar a este Foro el debate político-partidista que generan esas discre-

pancias. Lo hacemos sólo desde el punto de vista estrictamente jurídico.

En el orden constitucional, los antecedentes histórico-políticos atinentes constituyen fundamentos sólidos para reconocerle al Pueblo de Puerto Rico suficientes atributos de soberano, aunque no en su clásica extensión, para concluir y adjudicar —por vía de analogía al enfoque judicial que prevalece en cuanto a los estados de la Unión— que el encausamiento criminal concurrente en nuestros tribunales y en la corte federal por un mismo delito no infringe la cláusula de doble exposición contenida en el Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1, de nuestra Carta de Derechos ni en la Quinta Enmienda de la Constitución federal, L.P.R.A., Tomo 1. Véanse: *Heath* v. *Alabama*, 474 U.S. 82 (1985); *United States* v. *Wheeler*, 435 U.S. 313 (1978); *Abbate* v. *United States*, 359 U.S. 187 (1959); *Barkus* v. *Illinois*, 359 U.S. 121 (1959); *United States* v. *Lanza*, 260 U.S. 377 (1922).

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Aun cuando en nuestro carácter personal tenemos el derecho constitucional absoluto a crear y pensar acorde con nuestra particular visión de la vida y del mundo en que nos desenvolvemos, los integrantes de este Tribunal no podemos darnos el lujo de actuar y resolver los asuntos ante nuestra consideración conforme a esas creencias o deseos personales, con total abstracción de la *realidad jurídica* que nos rodea.

La opinión que suscribe y endosa una mayoría de este Tribunal en el presente recurso adolece de esa falla. La

misma resulta ser una gran contradicción jurídica. Luego de exponerse en la referida opinión, en forma correcta y completa, la doctrina jurisprudencial de la "soberanía dual" establecida por el Tribunal Supremo de Estados Unidos,[1] se concluye en dicha opinión que Puerto Rico, al amparo de la referida doctrina, tiene el poder de juzgar a una persona que ha sido juzgada por los mismos hechos en la jurisdicción federal.

Ello a pesar de que dicha doctrina jurisprudencial de la "soberanía dual", *por definición*, no es aplicable al caso de Puerto Rico, por cuanto resulta ser un hecho histórico y jurídico incuestionable que nuestro País nunca ha sido soberano y de que, conforme lo resuelto por el Tribunal Supremo de Estados Unidos, constitucionalmente continuamos siendo hoy día un territorio sujeto al poder de legislación del Congreso de Estados Unidos bajo la "cláusula territorial" del Art. IV, Sec. 3 de la Constitución federal,[2] *hecho que, inclusive, se acepta en la opinión mayoritaria emitida.*

En otras palabras, el Tribunal le atribuye a Puerto Rico una condición de "soberano" —la cual supuestamente adquirió luego del advenimiento del Estado Libre Asociado en el año 1952— para efectos de la doctrina de la "soberanía dual", cuando lo cierto es que desde un punto de vista estrictamente jurídico, de "soberano" Puerto Rico no tiene nada, *por cuanto "su fuente última de poder" para procesar a las personas que cometen delito dentro de sus límites territoriales continúa siendo el Congreso de Estados Unidos.*

---

[1] Esta doctrina tiene, a su vez, el efecto de evitar la aplicación del principio de que ninguna persona debe ser puesta en riesgo de ser castigada dos veces por la misma ofensa.

[2] *Harris v. Rosario*, 446 U.S. 651 (1980).

## I

Los aquí apelantes fueron acusados por violaciones a los Arts. 6, 8 y 11 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416, 418 y 421.

La defensa radicó una *Moción de Supresión de Evidencia y Moción para Desestimar bajo la Regla 64(e) y (f) de Procedimiento Criminal*, bajo el fundamento de que las acusaciones por violación al Art. 11 de la Ley de Armas de Puerto Rico, *supra*, eran cosa juzgada, ya que los acusados habían sido convictos, en relación con los mismos hechos en el Tribunal de Distrito Federal para el Distrito de Puerto Rico, de poseer armas con la serie mutilada. 18 U.S.C. secs. 922(b)(2) y 924(a).

El tribunal de instancia desestimó las acusaciones bajo el Art. 11 de la Ley de Armas de Puerto Rico, *supra*, razonando que, no obstante el establecimiento del Estado Libre Asociado, Puerto Rico no es un país soberano, por constituir "un brazo de la misma soberanía americana, y las leyes de los Estados Unidos necesariamente desplazan a las leyes locales que se relacionen con un mismo asunto a base de la doctrina de campo ocupado"; por lo que proseguir con dichas acusaciones violaría la prohibición contra la doble exposición conferida en la Quinta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, así como la conferida en el Art. II, Sec. 11 de nuestra Constitución, L.P.R.A., Tomo 1.

Una mayoría de este Tribunal revoca la antes mencionada resolución apoyándose, como expresáramos anteriormente, en que a partir de la aprobación de nuestra Constitución en 1952, el poder de Puerto Rico para crear y poner en vigor delitos emana no sólo del Congreso sino del consentimiento del Pueblo, y por tanto de sí mismo, por lo que le aplica la doctrina de la "soberanía dual". Se resuelve, en su consecuencia, que las acusaciones radicadas contra los apelantes en los tribunales de Puerto Rico por violación al

Art. 11 de la Ley de Armas de Puerto Rico, *supra*, en relación con los mismos hechos por los que ya habían sido convictos en el Tribunal de Distrito federal, no ofenden la prohibición constitucional contra la doble exposición.

No podemos suscribir dicha posición. Es por ello que disentimos.

## II

Es mandato constitucional que "[n]adie será puesto en riesgo de ser castigado dos veces por el mismo delito". Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 11, *supra*. Ninguna persona será sometida por el mismo delito dos veces a un juicio que pueda ocasionarle la pérdida de vida o la integridad corporal. Constitución de Estados Unidos, Quinta Enmienda, *supra*. Dicho principio fue incorporado en la Décimocuarta Enmienda y hecho aplicable a los estados en *Benton* v. *Maryland*, 395 U.S. 784 (1969).

Como es sabido, la Regla 64(e) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, recoge la referida protección constitucional como fundamento de desestimación al pliego acusatorio. Para poder invocar dicha defensa es menester que se haya iniciado o celebrado un primer juicio: (a) en un tribunal con jurisdicción; (b) bajo un pliego acusatorio válido; (c) por el mismo delito por el que se le acusa en el segundo juicio o por uno subsumido, por el cual pudo haber resultado convicto en el primer juicio. D. Nevares-Muñiz, *Sumario de Derecho Procesal Penal puertorriqueño*, 2da ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1981, pág. 92.

## III

Como correctamente se señala en la opinión mayoritaria emitida en el presente caso, es doctrina sólidamente arraigada en la jurisprudencia norteamericana que la disposición

prohibitoria de la doble exposición consagrada en la Quinta Enmienda de la Constitución de Estados Unidos, *supra*, no impide que los tribunales de un estado y los tribunales federales procesen criminalmente a una persona por delitos surgidos de un mismo acto o curso de conducta. *United States* v. *Lanza*, 260 U.S. 377 (1922); *Abbate* v. *United States*, 359 U.S. 187 (1959); *Bartkus* v. *Illinois*, 359 U.S. 121 (1959); *Heath* v. *Alabama*, 474 U.S. 82 (1985). Dicha doctrina —la cual se conoce como la doctrina de la "soberanía dual"— implica que cuando un mismo acto o curso de conducta constituye una ofensa contra dos soberanías distintas *que derivan su autoridad de fuentes diferentes*, ambas soberanías tienen poder para castigar el delito sin ofender la garantía constitucional contra la doble exposición. Dicho de otra forma, todo soberano tiene el poder inherente de determinar qué es una ofensa contra su autoridad y el de castigar esa ofensa ejerciendo su propia soberanía.

Procede que se enfatice el hecho —lo que surge con meridiana claridad de las decisiones antes mencionadas— qué *el criterio rector utilizado por el Tribunal Supremo federal para determinar si una entidad política es o no "soberana", a los efectos de la doctrina de la "soberanía dual", lo es la fuente última de la cual esa entidad política deriva su autoridad*; esto es, si existe o no "soberanía dual" entre dos entidades políticas a los fines de obviar la aplicación de la doctrina sobre doble exposición, *realmente depende de si la fuente última de donde estas entidades derivan su poder para procesar criminalmente a un acusado son diferentes o, por el contrario, es la misma.*

En lo referente a la relación existente entre el gobierno federal o central y los estados que componen la Unión norteamericana, ha razonado el Tribunal Supremo de Estados Unidos en las decisiones arriba citadas que éstos son comunidades políticas separadas *y que ambos derivan su poder de fuentes diferentes*, esto es, de las leyes orgánicas que respec-

tivamente los establecieron. Debe mantenerse presente que los estados federales eran "soberanos originarios" antes de entrar en la Unión y ceder parte de los atributos de su soberanía al gobierno central. Los Artículos de Confederación de 1781 reconocían plenos poderes de soberanía a los estados. El papel del gobierno central era limitadísimo y su poder estaba subordinado a la voluntad de los estados. M. Jensen, *The Articles of Confederation*, Wisconsin, Univ. of Wisc. Press, 1940.

Con la redacción de la Constitución de 1787 y su aprobación en 1789, los estados cedieron parte de su soberanía al recién creado Gobierno federal. No obstante, la fuente esencial de su soberanía seguía siendo el propio estado. Emda. X, Const. E.U., L.P.R.A., Tomo 1; *Coyle* v. *Oklahoma*, 221 U.S. 559 (1911); *McCulloch* v. *Maryland*, 4 Wheat 316, 410 (1819).

El Gobierno federal, por su parte, obtiene su autoridad del consentimiento de los estados originalmente soberanos al aprobar una constitución creando un poder ejecutivo, con poderes específicamente enumerados, Art. II, Constitución de Estados Unidos; un parlamento con poderes igualmente detallados, Art. I, y un poder judicial con jurisdicción limitada por la propia Constitución y por los estatutos pertinentes, Art. III, Constitución de Estados Unidos. Todos los poderes que no fueron cedidos pertenecen a los estados o al pueblo.

Completamente distinta es la situación referente a las relaciones entre el Gobierno de Estados Unidos y sus territorios, y entre los estados de la Unión y sus ciudades. Los territorios y las ciudades no son soberanos. Las ciudades son instrumentalidades gubernamentales subordinadas al estado y creadas por éste para llevar a cabo sus funciones gubernamentales. *Reynolds* v. *Sims*, 377 U.S. 533, 575 (1964). Cualquier poder que tenga la ciudad para castigar las ofensas que contra ella se cometen, se deriva del estado que la crea. *Waller* v. *Florida*, 397 U.S. 387, 393 (1970). Por lo tanto, en procedimientos criminales consecutivos de una ciu-

dad y el estado que la crea, contra un acusado, bajo los mismos hechos, procede la defensa de doble exposición.

Las relaciones entre el Gobierno de Estados Unidos y sus territorios se rigen por la misma regla que las ciudades y los estados debido a que los territorios son entera creación del Congreso y los tribunales del territorio ejercen su poder mediante la autoridad que les confiere el Congreso. *Grafton* v. *United States*, 206 U.S. 333 (1907); *United States* v. *Kagama*, 118 U.S. 375, 380 (1886).

Puerto Rico fue uno de los *territorios* cedidos a Estados Unidos por España mediante el Tratado de París de 1898. Por virtud de este tratado, la Isla deja de ser *territorio español* para convertirse en *territorio norteamericano*. En vista de ello, realmente no se requiere que uno sea muy perspicaz para poder percatarse del hecho de que las decisiones emitidas por el Tribunal Supremo de Estados Unidos —*y el razonamiento en ella contenido sobre la doctrina de "soberanía dual"*— en los casos de *United States* v. *Lanza, Abbate* v. *United States, Bartkus* v. *Illinois* y *Heath* v. *Alabama*, ante, no son aplicables, por definición, en el caso de Puerto Rico.

## IV

¿Varió en algo dicha situación con el advenimiento del Estado Libre Asociado de Puerto Rico? Dicho de otra forma, ¿ha dejado Puerto Rico de ser un territorio de Estados Unidos a partir de la aprobación de nuestra Constitución en 1952, convirtiéndose en un "soberano" con pleno poder para procesar criminalmente a quien comete delito bajo sus leyes, independientemente de que un tribunal federal haya enjuiciado previamente a una persona por los mismos hechos? ¿De dónde emana el poder de Puerto Rico para castigar a los ofensores de sus leyes? ¿Se ha convertido Puerto Rico en un "soberano" para efectos de la doctrina de la doble exposición?

Aun cuando no albergamos dudas sobre el hecho de que la Ley Núm. 600 del 81er Congreso de Estados Unidos, 64 Stat. 310, aprobada el 3 de julio de 1950, autorizó al Pueblo de Puerto Rico a organizar un gobierno local bajo una Constitución de su propia adopción, resulta sumamente importante que mantengamos siempre presente que al ser la referida Ley Núm. 600 "un acta" del referido Congreso, la misma no obliga a futuros Congresos y ésta puede ser enmendada unilateralmente por posteriores Congresos. *Community-Service Broadcasting, Etc.* v. *F.C.C.*, 593 F.2d 1102, 1103 (D.C. Cir. 1978).

Por otro lado, un ligero examen del historial legislativo de dicha ley es más que suficiente para demostrar que, no obstante la intención del Congreso de concederle a Puerto Rico el poder de autogobernarse en cuanto a sus *asuntos internos*, la intención legislativa fue a los efectos de que dicha ley no alteraría en forma alguna el *status* de Puerto Rico respecto a Estados Unidos.

En ese sentido, se manifestaron una serie de congresistas que laboraron intensamente en la aprobación de dicha medida legislativa, inclusive los principales propulsores puertorriqueños de la misma. En vistas públicas que se celebraron en torno a la aprobación de dicha ley, el entonces Gobernador de Puerto Rico, Hon. Luis Muñoz Marín, se expresó de la siguiente forma:

> *You know of course, that if the people of Puerto Rico would go crazy, Congress can always get around and legislate again.* But I am confident that the Puerto Ricans will not do that, and invite congressional legislation that would take back something that was given to the people of Puerto Rico as good United States citizens. (Énfasis suplido.)

El entonces Comisionado Residente, Hon. Antonio Fernós Isern, añadió:

> . . . S. 3336 *would not change the status of the island of Puerto Rico relative to the United States. It would not alter*

*the powers of sovereignty acquired by the United States over
Puerto Rico under the term of the Treaty of Paris.* (Énfasis
suplido.)

Según el informe del Comité de lo Interior y Asuntos In-
sulares del Senado:

The measure would not change Puerto Rico's fundamental
political, social and economic relationship to the United
States. Según citado en D.M. Helfeld, *Congressional Intent
and Attitude Toward Public Law 600 and the Constitution of
the Commonwealth of Puerto Rico,* 21 Rev. Jur. U.P.R. 255,
268 n. 52 (1952).

En palabras de un asesor legal de dicho Comité:

It is *our hope* and it is the *hope of the Government,* I think,
not to interfere with the relationship of the compact but nev-
ertheless *the basic power inherent in the Congress of the
United States, which no one can take away, is in Congress
. . . .* (Énfasis suplido.)(3)

Resulta sumamente ilustrativo —en relación con esta de-
sacreditada teoría de que lo que propició la referida Ley
Núm. 600 fue la formalización de un "pacto" (*compact*) entre
el Gobierno de Estados Unidos y el Pueblo de Puerto Rico—
lo expresado por el Prof. David M. Helfeld a los efectos de
que:

. . . Only two constitutionally feasible ways appear open on
which to ground a perpetually binding agreement: if Congress
were first to give Puerto Rico independence and then enter
into a bi-national treaty, or if by Constitutional amendment
Congress were permitted to bind itself perpetually with re-
spect to an abdication of power. There appears to be neither

---

(3) Para otras expresiones en el mismo sentido, véanse: D.M. Helfeld, *Con-
gressional Intent and Attitude Toward Public Law 600 and the Constitution of
the Commonwealth of Puerto Rico,* 21 Rev. Jur. U.P.R. 255 (1952); J.R. Torruella,
*The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal,*
Río Piedras, Ed. U.P.R., 1985, págs. 146–160.

evidence of intent nor a Constitutional basis for arguing the permanence or the bilateral character of the compact. Helfeld, *supra*, pág. 308.

La opinión mayoritaria, con el propósito de probar su contención de que "el *status* actual [de Puerto Rico] es el producto bilateral de un proceso que goza de la naturaleza de un convenio entre dos entes gubernamentales", transcribe extensamente —*en su esc. 20*— el debate ocurrido ante el Comité de lo Interior y Asuntos Insulares del Senado de Estados Unidos. Lo allí expresado tiene el efecto de fortalecer y confirmar nuestra posición de que la Ley Núm. 600 no alteró en forma alguna el *status* de Puerto Rico respecto al Gobierno de Estados Unidos. Adoptamos, por referencia, el mencionado esc. 20 de la opinión mayoritaria, excepto el último párrafo del mencionado escolio, por cuanto el mismo no forma parte del historial legislativo de la Ley Núm. 600 y sí constituye unas expresiones personales del autor de la obra allí citada.

## V

Si alguna duda existía sobre que la referida Ley Núm. 600 no tuvo el efecto de alterar o cambiar nuestro *status* territorial, la misma rápidamente se ha disipado a la luz de una serie de decisiones emitidas por el Tribunal Supremo de Estados Unidos, mediante las cuales dicho Foro ha sostenido la validez constitucional de legislación aprobada por el Congreso de Estados Unidos que abiertamente resulta discriminatoria contra Puerto Rico y los ciudadanos americanos residentes en la Isla. El fundamento aducido por el mencionado Tribunal para sostener la constitucionalidad de dichas leyes ha sido que el Congreso de Estados Unidos puede tratar a Puerto Rico y sus ciudadanos residentes de manera distinta a los estados de la Unión *al amparo de la autoridad conferídale por la cláusula territorial de la Constitución federal.*

Véanse: *Califano* v. *Torres*, 435 U.S. 1 (1978); *Torres* v. *Puerto Rico*, 442 U.S. 465 (1979); *Harris* v. *Rosario*, 446 U.S. 651 (1980).

A ese respecto expresó, en *Harris* v. *Rosario*, ante, págs. 651–652, el Tribunal Supremo federal que "el Congreso, el cual tiene el poder bajo la Cláusula Territorial de la Constitución, Constitución de los Estados Unidos, Art. IV, Sec. 3, cl. 2, 'para hacer todas las Reglas o Reglamentos necesarios con respecto al Territorio . . . perteneciente a los Estados Unidos', puede tratar a Puerto Rico de manera distinta a los estados siempre que exista una base racional para su acción". (Traducción nuestra.)

Lo así resuelto por el Tribunal Supremo nacional encuentra apoyo en la historia. Si recordamos, el Congreso de Estados Unidos unilateralmente enmendó la Constitución del Estado Libre Asociado con posterioridad a ésta ser "aprobada" por el Pueblo de Puerto Rico. Véase Ley Púb. Núm. 447, 66 Stat. 327, mediante la cual el referido Congreso eliminó de nuestra Constitución la Sec. 20 de la Carta de Derechos. *Mal puede hablarse de que Puerto Rico es un ente soberano cuando otro ente político tiene el poder para unilateralmente enmendarle su Constitución.*

Nuevamente nos ilustra al respecto el profesor Helfeld:

Though the formal title has been changed, in constitutional theory Puerto Rico remains a territory. This means that Congress continues to possess plenary but unexercised authority over Puerto Rico. *Constitutionally, Congress may repeal Public Law 600, annul the Constitution of Puerto Rico and veto any insular legislation which it deems unwise or improper.* (Énfasis suplido.) Helfeld, *supra*, pág. 307.

## VI

Apoya específicamente el Tribunal su conclusión a los efectos de que es de aplicación a Puerto Rico la doctrina de la "soberanía dual" en la decisión emitida por el Tribunal Su-

premo de Estados Unidos en *United States* v. *Wheeler*, 435 U.S. 313 (1978).

En dicho caso el Tribunal Supremo federal extendió la aplicación de la referida doctrina a una situación en que se juzgó, por los mismos hechos, a un miembro de las tribus Navajo tanto en una corte de dicha tribu como ante un tribunal federal. El Tribunal Supremo nacional razonó que el poder de una tribu Navajo para castigar ofensas contra sus leyes cometidas por miembros de su propia tribu, emanaba de su "soberanía original o primitiva" (*primeval sovereignty*) y de una "soberanía retenida" y no como delegación alguna por parte del Congreso.

En otras palabras, el fundamento para obviar la doctrina de que ninguna persona debe ser puesta en riesgo de ser castigada dos veces por la misma ofensa (*double jeopardy*) se justifica en dicha situación, según el Tribunal Supremo federal, ya que la "soberanía" de las tribus Navajo es, inclusive, *original, anterior* y *diferente* a la de la propia nación americana.

En vista de ello, realmente nos resulta difícil comprender el argumento de la mayoría del Tribunal a los efectos de que el caso de *United States* v. *Wheeler*, ante, resulta ser "particularmente instructivo" en relación con la situación específica de Puerto Rico. *Como es sabido, Puerto Rico nunca ha gozado de una soberanía original debido a que, como expresáramos anteriormente, fue cedido por España a Estados Unidos y sobre esa condición original es que se funda su relación con la nación norteamericana.* No procede en nuestro caso, en su consecuencia, hablar de "soberanía original y primitiva".

## VII

No es la soberanía en relación con asuntos internos la que faculta a una entidad política para procesar sucesivamente a un individuo que ha sido previamente procesado por un tri-

bunal federal por los mismos hechos. *No es a esta soberanía "limitada" a la que se refiere la doctrina de la "soberanía dual".* Como se dijo claramente en *United States* v. *Wheeler,* ante, pág. 320, "no es el grado de control ejercido por una de las autoridades procesadoras sobre la otra, *sino la fuente última de donde emana el poder bajo el cual los respectivos procesos se llevan a cabo".* (Énfasis suplido y traducción nuestra.)

En el caso de Puerto Rico, la fuente última de donde emana el poder bajo el cual se procesa criminalmente a un individuo *ha sido y sigue siendo el Congreso de Estados Unidos* a través de la Cláusula Territorial. Art. IV, Sec. 3, cl. 2, Const. E.U., L.P.R.A., Tomo 1.

El poder general que posee Puerto Rico para procesar criminalmente a los ofensores de sus leyes proviene de la delegación hecha a la Isla por el Congreso de Estados Unidos para regular sus asuntos internos, delegación que comenzó con la primera ley aprobada por el referido Congreso para regir las relaciones entre Estados Unidos y Puerto Rico, la Ley Foraker en 1900, 31 Stat. 77. *Ese poder general de regular sus asuntos internos, sin embargo, no puede ni debe ser confundido —como lo hace la mayoría de este Tribunal— con el concepto de "soberanía" utilizado por el Tribunal Supremo federal en la doctrina de "soberanía dual".*

En resumen, Puerto Rico no está facultado para procesar criminalmente a una persona que haya sido juzgada ante un tribunal federal por los mismos hechos *debido a que la "fuente última" de donde emana la autoridad o poder para los dos procedimientos es la misma: el Congreso de Estados Unidos.*

Por lo anteriormente expuesto, resulta evidente que las acusaciones contra los apelantes en el tribunal de instancia por violaciones al Art. 11 de la Ley de Armas de Puerto Rico, *supra,* en relación con unos mismos hechos por los que éstos ya han sido convictos en el Tribunal de Distrito Federal para

el Distrito de Puerto Rico, constituyen cosa juzgada y violan la prohibición constitucional contra la doble exposición contenida en la Quinta Enmienda de la Constitución de Estados Unidos, *supra*, así como la contenida en el Art. II, Sec. 11 de nuestra Constitución, *supra*.

Confirmaríamos la resolución del tribunal de instancia.